**UNITED STATES of America**

v.

**AMERICAN RENAISSANCE LINES,
INC., Appellant.**

**No. 72-2109.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 29, 1973.

Decided Feb. 27, 1974.

Julius Kaplan, Washington, D. C., for appellant.

David V. Hutchinson, Atty., Dept. of Justice, for appellee. Harold H. Titus, Jr., U. S. Atty., Robert E. Kopp and Kieron F. Quinn, Attys., Dept. of Justice, were on the brief for appellee.

Before BAZELON, Chief Judge, and WILKEY, Circuit Judge and VAN PELT,* United States Senior District Judge for the District of Nebraska.

WILKEY, Circuit Judge:

This appeal was taken from an order of the District Court which, in effect, held that the Commodity Credit Corporation [CCC], a government agency, could enforce an oral charter agreement with a private shipping firm, the American Renaissance Lines, Inc. [ARL]. The District Judge denied defendant ARL's motion for judgment on the pleadings, however, believing that there was "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termina-

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

tion of the litigation."[1] The District Judge certified the oral contract question to this court for an interlocutory appeal. After consideration of the certified question, we view the matter differently from the District Court and remand for action consistent with this opinion.

## I. THE NATURE OF THE CHARTER AGREEMENT

In May 1966 the CCC issued by telephone and telegraph a general invitation to private enterprise to bid on the carriage of a large amount of foodstuffs from the United States to South Vietnam. The invitation to bid required that all offers be delivered either in person or by telephone. Acting through its agent Universal Shipping Corporation, ARL entered a bid. On 9 May 1966 oral agreement was reached with CCC's agent, the Ocean Transportation Division of the Foreign Agricultural Service of the U.S. Department of Agriculture. ARL proposed the SS Eviliz to transport the foodstuffs under charter to the U.S. Government. The oral agreement was subject to the terms of the telegraphed invitation to bid, and the USDA Grain Charter Party (1 March 1963 Revision).[2] On 11 May 1966 the parties orally agreed through their agents to allow ARL to substitute another ship for the SS Eviliz, which ARL had been unable to purchase.

ARL repudiated the oral agreement on 18 May 1966 and refused performance. However, ARL did offer by telegram to pay any extra storage charges until other carriage was obtained. This refusal of performance occurred before any written charter or contract had been signed. The failure of the agreement caused the Government additional storage, handling, and shipping costs, in the amount of $40,309.67.

In November 1971 the United States brought suit in District Court for the additional costs of $40,309.67 plus interest from May 1966. This dormant claim was thus revived 5½ years after the oral agreement had been breached, and several months after ARL had won a suit against the Government in the U.S. District Court for the Eastern District of New York on an unrelated admiralty action in the amount of $43,421.00.[3] ARL answered the government complaint and sought a judgment on the pleadings, in part on the ground that the CCC could not enforce a government charter agreement made orally only. After denial of the motion by the District Court, ARL moved for reconsideration or alternatively certification of the oral contract question to the Court of Appeals for an interlocutory appeal.[4] The District Court did not grant the substantive motion but did grant certification. We allowed the appeal by order of 13 October 1972.[5]

## II. THE ENFORCEABILITY OF THE ORAL CONTRACT BY THE GOVERNMENT

The issue before this court is limited to the question whether the CCC, a government agency, can obtain damages for an unperformed oral contract for carriage. We believe that both the relevant statutes and regulations require that government contracts such as the charter agreement here be written in or-

---

1. 28 U.S.C. § 1292(b) (1970). If the District Judge so finds, the statute directs him to so state in his order. The Court of Appeals may then in its discretion permit an appeal.

2. The telegram invitation to bid stated: "For full cargoes USDA Grain Charter Party dated March 1, 1963 (Revised) to be used." Appendix to Appellant's Brief at 6. A sample of the charter party is provided in the Appendix at 8–15. Examination of the sample charter party shows the document to

be a highly detailed eight-page agreement, with blank spaces provided for insertion of material pertinent to each particular contract.

3. *See* Brief for Appellant at 5–6.

4. This was pursuant to 28 U.S.C. § 1292(b). *See* note 1 *supra.*

5. The District Court's certification to the Court of Appeals is reproduced in Appendix at 99. Our order allowing the appeal is in Appendix at 100.

der to be enforceable by the Government. Hence, in answer to the certified question we hold that this oral contract is unenforceable.

### A. *The Statute*

In 1955 the Congress, troubled by executive spending,[6] enacted § 1311(a)(1) of the Supplemental Appropriation Act.[7] This section provided that

> After August 26, 1954 no amount shall be recorded as an obligation of the Government of the United States unless it is supported by documentary evidence of—
>
> (1) a binding agreement in writing between the parties thereto, including Government agencies, in a manner and form and for a purpose authorized by law, executed before the expiration of the period of availability for obligation of the appropriation or fund concerned for specific goods to be delivered, real property to be purchased or leased, or work or services to be performed.[8]

The original purpose of the statute was to prevent executive officials from excessive or inappropriate spending.[9]

The parties to this litigation urge contrary interpretations of this provision. On the one hand, the Government urges that the statute is simply a recordation statute to facilitate auditing and has no effect on government contracts with private parties. On the other hand, ARL argues that the provision, in conjunction with certain regulations, establishes virtually a statute of frauds for such government contracts as involved here. Sustaining the government position here would remove reciprocally the protection of the Government which was the initial intent of the statute, and this we decline to do.

■ We hold that the statute does establish a requirement that government contracts of this type be in writing, and that contracts which are merely oral are not enforceable. We agree with the Government that this statute does not follow the typical statute of frauds format.[10] But we do not believe that to be determinative. Rather, we feel that the Congress was concerned that the executive might avoid spending restrictions by asserting oral contracts, and so enacted the requirement of a writing.[11]

The Supreme Court long ago considered a similar question in Clark v. United States.[12] Although the statute there involved has since been repealed, it was similar to the statute here in that it required government contracts of certain departments to be in writing.[13] The Su-

---

6. *See, e. g.,* 100 Cong.Rec. 13056–57 (1954).

7. 68 Stat. 830, 31 U.S.C. § 200(a)(1) (1970).

8. Other subsections of § 200(a) provide that documentary evidence of valid loan agreements, orders required by law to be placed with a government agency, and so forth will also meet the requirements.

9. The House Report noted the purpose of the provision:
   > Over a period of years numerous loose practices in handling appropriated funds have grown up in various agencies of the government. The most difficult problem in this area arises from the recording of various types of transactions as obligations of the government when, in fact, no real obligation exists. This situation has become so acute as to make it next to impossible for the Committee on Appropriations to determine with any degree of accuracy the amount which has been obligated against outstanding appropriations as a basis for determining future requirements. It has become necessary to set forth definitively in the law the types of transactions which will be recognized as true obligations and secure accurate reporting thereon in order that it may be possible for the Committee on Appropriations to have a sound basis for its operations. Section 1111 therefore has been included in the bill to accomplish this purpose.
   >
   > H.Rep.No.2266, 83rd Cong., 2d Sess. 49–50 (1954).

10. *See* Brief for Appellee at 14–16.

11. *See* note 9 *supra.*

12. 95 U.S. 539, 24 L.Ed. 518 (1877).

13. The statute provided
    > That it shall be the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior, immediately after the passage of this act, to cause and require every contract made by them severally on behalf of the govern-

preme Court held that this statute effectively established a statute of frauds. The oral agreement made by the Government to charter a steamer from a private party was hence void. The Court, however, did allow the owner of the steamer to recover from the Government for the value of services rendered, on a theory of *quantum meruit*.[14] Justice Bradley wrote for the Court:

> The facility with which the government may be pillaged by the presentment of claims of the most extraordinary character, if allowed to be sustained by parol evidence, which can always be produced to any required extent, renders it highly desirable that all contracts which are made the basis of demands against the government should be in writing. Perhaps the primary object of the statute was to impose a restraint upon the officers themselves, and prevent them from making reckless engagements for the government; but the considerations referred to make it manifest that there is no class of cases in which a statute for preventing frauds and perjuries is more needed than in this.[15]

While the *Clark* case dealt with a private party trying to collect from the Government, the principles enunciated above remain true when the situation is reversed and the Government is seeking damages. The requirement of a written

contract protects both sides from the possibility of fraud or misinterpretation by the other. And, on the principle of mutuality, it is not appropriate for the Government to assert the lack of a written contract when it wishes an agreement to lapse, but to waive such an objection when it wishes to enforce an agreement.

In fact, if the Government's position of no mutuality were accepted, the agreement would not meet the basic contractual prerequisite of consideration from each contracting party.[16] For if the Government could avoid its part of the bargain by asserting lack of a written contract, the Government would be making merely an illusory promise: the Government would pay the agreed price for the services only if *it* wished and if *it* had complied with the statute (and regulations, *infra*). The Government could avoid payment by citing the statute and its own failure to follow its own regulations, and then the private party would be limited to *quantum meruit*. Such an arrangement clearly would not satisfy the requirement of mutual consideration.

The Supreme Court decision in 1915 of United States v. New York and Porto Rico SS Co.[17] can be distinguished from the present case. In that earlier case, the Government sought to recover from a private steamship company which had

---

ment, or by their officers under them appointed to make such contracts, to be reduced to writing, and signed by the contracting parties with their names at the end thereof, a copy of which shall be filed by the officer making and signing the said contract in the "returns office" of the Department of the Interior . . . as soon after the contract is made as possible, and within thirty days, together with all bids, offers, and proposals to him made by persons to obtain the same, as also a copy of any advertisement he may have published inviting bids, offers, or proposals for the same; all the said copies and papers in relation to each contract to be attached together by a ribbon and seal. . . .

*Id.* at 541. The statute, known as Rev.Stat. 3744, was repealed in 1941. 55 Stat. 743.

14. This was detrimental to the private party, for the ship was wrecked while in government hands. The oral contract had provided that the Government would bear the risk of destruction. But since the oral contract was void, the owner could not utilize that provision and was forced to bear the risk of destruction himself.

15. 95 U.S. at 541–542.

16. *See* 1 A. Corbin, Contracts § 145 at 628 (1963): "an illusory promise is neither enforceable against one making it nor is it operative as a consideration for a return promise." The Government's "promise" would be illusory if it could avoid it at will. *See also* 1 S. Williston, Contracts § 105 at 417 (3rd ed. 1957).

17. 239 U.S. 88, 36 S.Ct. 41, 60 L.Ed. 161 (1915).

not performed its written agreement to ship coal. The company raised as a defense the failure of the Government to comply with the exact writing requirements of the same statute as involved in *Clark*,[18] by not producing proper copies and seals. The Court held that the Government could waive the requirements because it was the only intended beneficiary of the protection. The private company "needs no such protection against a written undertaking signed by himself."[19] In the case at bar, however, what is lacking is not simply the proper form or seal but a written contract in its entirety. Such of the entire agreement as was made was made orally, and no writing was sent until after the agreement was repudiated. ARL claims that vital provisions were never agreed upon, and disputes the CCC version of what was actually agreed to, *e. g.*, whether long or short tons were meant is still in controversy. Protection for the private company, as well as the Government, is necessary under these circumstances.

A somewhat related issue was considered by the Court of Claims in Escote Manufacturing Co. v. United States.[20] There the court stated that an oral contract to buy surplus government property was as binding on the private party as if it had been in writing. However, the facts in *Escote* are markedly different from this case. In *Escote* the private bidder had sent a written bid and check for deposit in response to the Government's invitation to bid for surplus

goods. The Government then sent the bidder a letter containing three copies of a form headed "Invitation, Bid, and Acceptance" for signature by the bidder. The bidder sought to avoid the contract on the ground that the contracting officer of the Government had not signed the form, but his name was only typewritten. Thus, the issue was not whether there was a written agreement, but simply whether the signature of the contracting officer was required.

Although *Escote* was decided after the 1955 statute requiring written contracts, the Court of Claims stated that the parties had not identified any statute requiring a writing. The court felt that the contract forms sent by the Government to the private buyer, which were not signed, were merely part of the Government's bookkeeping system. At no time in its opinion did the court give consideration to the statute or regulations in effect here. Consequently, the *Escote* opinion is of limited value in deciding this case.[21]

We view the statute as establishing a requirement that a government contract as involved here be in writing before either party may be allowed to obtain court enforcement of the agreement. The statute admittedly is not phrased as the typical statute of frauds. It is more specific, in that it requires that the contract be supported by documentary evidence of a binding agreement in writing.[22] Although the statute simply bars recording oral contracts as obligations of the Government,[23] this does not

18. *See* note 13 *supra*.

19. 239 U.S. at 93, 36 S.Ct. at 42.

20. 169 F.Supp. 483, 144 Ct.Cl. 452 (1959).

21. Similarly unhelpful is the Court of Claims decision in Penn-Ohio Steel Co. v. United States, 354 F.2d 254, 173 Ct.Cl. 1064 (1965). The Court of Claims again asserted that federal law did not require a contract to be in writing. The context of this decision was an action by a steel products plant lessee against the Government for alleged breach of a lease by the Navy, the lessor. Again, no citations to the statute at hand in

the case at bar appear in the Court of Claims opinion.

22. See p. 1062 *supra* for the precise statutory language.

23. The Government argues that 31 U.S.C. § 200(a)(8) dissipates the requirement of a writing which we believe is established by § 200(a)(1). Section 8 provides that the recordation requirements will be satisfied by documentary evidence of "any other legal liability of the United States against an appropriation or fund legally available therefor." We do not believe that section 8 was intended to swallow up the other provisions,

mean that recordation is the only purpose or effect of the statute. If the Government does not fulfill the recordation requirements, it can neither automatically take the benefit of an agreement it has allegedly made, nor can it be hurt by another party alleging an agreement. Mutuality of protection is thus provided, and we do not see by the Government's interpretation of the statute anything but one-sided protection would be afforded.

We believe that this interpretation of the statute is in accordance with the legislative intentions. The House Conference Report on the provision offers a succinct summary of the legislative view:

> Section 1311(a)(1) precludes the recording of an obligation unless it is supported by documentary evidence of a binding agreement between the parties as specified therein. It is not necessary, however, that this binding agreement be the final formal contract on any specified form. The primary purpose is to require that there be an offer and an acceptance imposing liability on both parties. For example, an authorized order by one agency on another agency of the Government, if accepted by the latter and meeting the requirement of specificity, etc., is sufficient. Likewise, a letter of intent accepted by a contractor, if sufficiently specific and definitive to show the purposes and scope of the contract finally to be executed, would constitute the binding agreement required.[24]

### B. *The Regulations*

Several regulations of the Executive branch further support our view that a written contract is necessary to bind ARL here. The regulations include general Federal Procurement Regulations[25] and regulations specific to the CCC.[26]

The Federal Procurement Regulations [FPR's] were promulgated pursuant to the Federal Property Act[27] to regulate all government agency procurement. Specifically FPR § 1–1.208 provides a definition of contract:

> "Contract" means establishment of a binding legal relation basically obligating the seller to furnish personal property or nonpersonal services (including construction) and the buyer to pay therefor. It includes all types of *commitments which obligate the Government to an expenditure of funds and which, except as otherwise authorized, are in writing.* In addition to a two-signature document, it includes all transactions resulting from acceptance of offers by awards or notices of awards; agreements and job orders or task letters issued thereunder; letter contracts; letters of intent; and orders, such as purchase orders, under which the contract becomes effective by written acceptance or performance. It also includes contract modifications. (Emphasis added.)

FPR § 1–1.219 defines "contract modification" to be "written alteration."

The Government urges that § 1–1.208 merely says that a contract is the "establishment of a binding legal relation" and is broadly defined to include oral agreements. We believe that the Government has misinterpreted the definition. The regulation requires a writing, except as otherwise authorized. It does not require a formal two-signature document, but it does require some form of writing, whether letters of intent, or purchase orders, or some other written manifestation.

It must be noted that the scope of the FPR's is limited by the Federal Property Act, which states in relevant part that the Act and accompanying regulations shall not be interpreted to impair

---

but instead it was intended to develop another, independent category requiring documentary evidence.

24. H.Rep.No.2663, 83rd Cong., 2d Sess. 18 (1954).

25. 41 C.F.R. §§ 1–1.208, 1–1.219 (1973).

26. 7 C.F.R. § 11.12(a) (1973).

27. 40 U.S.C. § 486(c) (1970).

the authority of any executive agency with respect to any phase, including transportation,

> of any program conducted for purposes of resale, price support, grants to farmers, stabilization, transfer to foreign governments, or foreign aid, relief, or rehabilitation: *Provided,* That the agency carrying out such program shall, to the maximum extent practicable, consistent with the fulfillment of the purposes of the program and the effective and efficient conduct of its business, coordinate its operations with the requirements of said chapters and the policies and regulations prescribed pursuant thereto.[28]

Thus, while the FPR's are not mandatory, and agencies may carve out exceptions, there is strong pressure on the CCC to conform to them insofar as possible.[29]

■ The CCC has not adopted regulations exempting it from the writing requirement in the FPR definition of contract. Not only do CCC regulations explicitly adopt the FPR's,[30] but also CCC's own regulations incorporate an additional writing requirement.[31] And, the Government has pointed to no cases wherein the CCC has stated that it rejects the requirement of a writing. The Government does suggest that the CCC's charter instructs it to follow the usual and customary channels of trade and commerce,[32] and that oral contracts to be followed by written charters are customary. Whether such oral agreements are customary in shipping, we do not believe that the CCC charter provision was intended to cover the formalities of a

contract; rather, it tells the CCC to use normal commercial, as opposed to governmental, means for transporting goods. In the face of the regulations governing the CCC, this charter provision should not be interpreted as removing the writing requirement.

A regulation more directly applicable to the CCC is 7 C.F.R. § 11.12(a), which provides specifically for ocean transportation of goods for the CCC:

> The cost of ocean transportation will be financed by CCC only when specifically provided for in the purchase authorization. Unless the purchase authorization provides otherwise, this section will apply to the financing of ocean transportation. Unless otherwise specifically provided in the applicable purchase authorization or unless otherwise requested by FAS, the pertinent terms of all proposed charters . . . and all proposed liner bookings must be submitted to the appropriate USDA Office . . . for review and approval prior to fixture of the vessel. Tentative advance approvals may be obtained by telephone or telegram, provided Form CCC 105, Ocean Shipment Data-PL 480 ("Request for Vessel Approval"), is furnished promptly confirming the information supplied by telephone or telegram. Approvals of charters and liner bookings will be given on Form CCC 106, "Advice of Vessel Approval."

Thus, use of particular forms is required prior to "fixture" of a ship. While the regulation does not explicitly state that an oral contract is unenforceable, that meaning is apparent.

---

28. 40 U.S.C. § 474(2) (1970).

29. See also FPR § 1–1.009–2, requiring deviations to be minimized, and § 1–1.009–1 defining deviations.

30. 41 C.F.R. § 4–1.104–1 (1967): "Procurement by the Department of Agriculture is subject to the FPR . . . except as may be otherwise authorized by law."

31. The CCC regulations are discussed in detail *infra.*

32. 15 U.S.C. § 714b(h), 714c. In particular, § 714c requires that in the transporting of agricultural commodities,

> the Corporation shall, to the maximum extent practicable consistent with the fulfillment of the Corporation's purposes and the effective and efficient conduct of its business, utilize the usual and customary channels, facilities, and arrangements of trade and commerce.

Neither of the parties has cited to this court any cases interpreting the CCC charter, and we have found none ourselves.

The Government objects that the CCC regulations are inapplicable because the foodstuffs were being shipped under Title II of PL 480, rather than Title I. The significance of this difference is that Title I provides for the *sale* of surplus agricultural commodities overseas and is administered by the U.S. Department of Agriculture. Title II provides for the *donation* of surplus agricultural commodities for relief and is administered by the State Department. The CCC regulations apply only to Title I.[33] The State Department regulations do not provide any form or writing requirement for a contract.[34]

As ARL correctly points out, there was no indication given by the Government that Title II rather than Title I activity was being undertaken. ARL was negotiating with the CCC and had a right to assume that the CCC would follow its own published regulations. Furthermore, while Title II regulations do not mention writing of contracts, AID has specifically adopted the FPR's in general, with no exception from the definition of contract.[35] So, even if Title II were applicable, the FPR definition would still be effective.

The Government also argues that even if Title I were applicable, it merely establishes requirements for importing countries to produce written charters for ocean transportation to obtain USDA approval of financing.[36] Whether or not the writing requirement is directed to importing countries or shippers, the fact remains that certain forms are to be used before USDA approval will be granted; USDA need not finance any non-conforming charters. We believe this suggests a requirement of a written contract, similar to the statutory requirement. Unenforceability of any oral agreement determines the position of both parties: just as USDA could refuse to finance the oral charter here, so, too, can ARL raise the lack of a writing as a defense to an action for breach of contract.

## III. CONCLUSION

We conclude that an oral agreement for charter of a ship, such as involved in this case, is not sufficient to allow the Government to recover in a damage action for breach of contract. The applicable statute and regulations require a written agreement. We reach this conclusion not only on the basis of the statute and regulations, but also on two additional factors.

---

33. § 11.12(a), in text *supra.*

34. *See* 22 C.F.R. Part 211 (1967). However, § 211.5(b) should be noted. This provides that
    > A separate Transfer Authorization will be issued to cover the ocean freight financed by the United States. Disbursement to carriers shall be made by USDA upon presentation of Standard Form 11–13, three copies of SF 11–13a, three copies of the ocean bill of lading, and a signed copy of the booking agreement.

    This would seem to indicate that something must be written before USDA will pay. The effect of this provision is weakened by § 211.10, which states that "AID may waive, withdraw, or amend, at any time, any or all of the provisions of this Part 211."

35. 41 C.F.R. § 7–1.103 (1967), in effect when the agreement was made, states that
    > Unless a deviation is specifically authorized in accord with AIDPR 7–1.107, or unless otherwise provided, FPR and AIDPR apply to all procurements . . . of personal property and nonpersonal services to which AID is a direct party. This regulation does not apply to procurements by other parties, such as borrowers and grantees, which are financed under programs administered in whole or part by AID, nor to contracts entered into jointly by AID and the borrower or grantee to make a procurement from a third source for an overseas program or activity.

    Furthermore, 41 C.F.R. § 7–1.107–2 (1973), which became effective on 26 October 1967, states that
    > It is the policy of AID that deviation from the mandatory requirements of FPR and AIDPR shall be kept at a minimum, and be granted only if it is essential to effect necessary procurement and when special and exceptional circumstances make such deviation clearly in the best interests of the Government.

36. *See* Brief for Appellee at 24.

First, the parties themselves seem to have contemplated a written agreement, as indicated by the incomplete USDA Grain Charter Party which was to be used. Given the extent of the unfilled blanks in the form, it appears that the oral agreement did not represent a final meeting of the minds of the two parties.[37]

Second, the nature of the contract at issue here is lengthy and complex. The parties do not agree now on all of the proposed terms of the agreement.[38] Where such complex transactions are involved, there is a policy favoring written agreements.[39]

Recapitulating our analysis of the position of the parties in regard to the statute, we can readily see that the wording of the 1955 Act, cast as it is in the phraseology "no amount shall be recorded as an obligation of the Government," and enacted for the primary purpose of keeping free-spending officials in check, does not carry an inescapable interpretation as a statute of frauds. Yet the 1955 statute does call for "documentary evidence of a binding agreement in writing between the parties thereto," and the impact of this requirement does inescapably fall on both the Government and the private party to the contract. Most persuasively perhaps, it appears impossible to give effect to the avowed primary objective of Congress without construing the 1955 Act as a statute of frauds. We have here the Government seeking damages on the basis of a purely oral agreement, admittedly incomplete or confused on some terms argued to be vital to the obligations of the parties, intended to be but never reduced to writing before repudiation. If we enforce the Government's claim here on a purely oral charter contract, the next case arising may well be similar to Clark v. United States, i. e., a claim by the private party likewise based on a purely oral agreement, in which the facts hypothetically might show that the government official blithely ignored all the required written safeguards of the 1955 Act. If we adopt the Government's theory here, the very restricted interpretation of the 1955 Act, in our hypothetical next case the Government could not successfully urge the unenforceability of a purely oral charter—it would have been stripped of this external defense and concomitantly of protection against the very internal abuses which even the Government here agrees was Congress' primary objective in the 1955 statute.

It is thus dubious that the Government would want to contract orally, or that it should. This decision, by requiring that the Government comply with statutes and its own regulations by requiring a writing before an agreement of this type may be enforced by the courts, is in the long-range interest of the Government and the public.

---

37. Other cases have denied enforcement of an agreement where the parties contemplated but did not complete a written contract. *See, e. g.,* Orient Mid-East Great Lakes Service v. International Export Lines, 315 F.2d 519, 523 (4th Cir. 1963) ; Banking & Trading Corp. v. Floete, 257 F.2d 765, 769–770 (2d Cir. 1958).

38. For example, see Brief for Appellant at 30.

39. *See* Orient Mid-East Great Lakes Service v. International Export Lines *supra.*