**Betsy KINZLEY, Personal Representative of Judd Kinzley, Deceased,**

v.

**The UNITED STATES.**

No. 503–79C.

United States Court of Claims.

Sept. 23, 1981.

188

Francis G. Fleming, Phoenix, Ariz., atty. of record, for plaintiff.

Zinora Mona Mitchell, Washington, D. C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant.

William D. Holeman, Dept. of the Interior, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, SKELTON, Senior Judge, and KUNZIG, Judge.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

FRIEDMAN, Chief Judge, delivered the opinion of the court:

This suit seeks damages for the breach by the Bureau of Indian Affairs (Bureau) of an oral contract to employ the plaintiff [1] as the Program Coordinator of its Indian Construction Company Program (Program) for one year at a monthly salary of $2,500 and reasonable expenses. Both parties have moved for summary judgment, and we heard oral argument. We hold that the plaintiff had an enforceable personal services contract with the Bureau, but we reserve for trial the question whether the parties modified the contract when the plaintiff accepted a temporary civil service appointment covering the same work. We also dismiss the plaintiff's claim for damages flowing from the loss of other contracts.

I.

The following facts are not disputed. In September 1976, the Bureau of Indian Affairs and the Department of Health, Education and Welfare (HEW) entered into an agreement to undertake jointly a national program to assist Indian tribes in developing their own construction companies.

1. Subsequent to filing his petition, the original plaintiff died. His personal representative was substituted as plaintiff on July 17, 1980. For the sake of clarity, however, we refer to the deceased, Judd Kinzley, as the plaintiff.

HEW agreed to finance the program and the Bureau to administer it for a one-year period from October 1, 1976 to September 30, 1977.

As part of this agreement, the Bureau agreed to "[d]esignate an Agreement coordinator before October 1, 1976 for the purpose of coordinating activities directed toward achieving the purpose" of the program. Early in September 1976, Bureau officials discussed with the plaintiff the possibility of employing him in that capacity. He already had served as an "Indian Action Team Director" in connection with similar Indian construction programs in the Northeast.

The Bureau officials who participated in these discussions included Peter J. Martin, Chief of the Indian Technical Assistance Center, Denver, Colorado, and two officials in the Bureau's Washington, D. C., offices: John Jollie, Chief of the Division of Job Placement and Training (Mr. Martin's immediate supervisor), and Dan McDonald, Director of the Tribal Resources Development Program (Mr. Jollie's supervisor). According to a memorandum by Mr. Jollie, these officials "agreed that [the plaintiff] would be the ideal person to be the agreement coordinator" and, faced with "extreme time constraints because of the timing of [the interagency] agreement, ... informed [the plaintiff] that [they] would make every effort to secure his services for the coordinator's position."

The defendant admits in its motion that these "[d]iscussions culminated in a verbal agreement between plaintiff and BIA representatives under which plaintiff was to perform as Program Coordinator for one year, commencing in September 1976, at a compensation rate of $2,500.00 per month, plus expenses." On or about September 13, 1976, the plaintiff accepted the position and began his duties.

Shortly thereafter, Mr. Jollie wrote a letter, at the request of the plaintiff, to Valley National Bank, a creditor of the plaintiff. This letter stated that "we have entered into an agreement with" the plaintiff to perform the designated services and stated the plaintiff's compensation under "our agreement." The letter, however, did not state the expected duration of the employment. Mr. Jollie signed this letter in his official capacity, and it was on an official Bureau letterhead. The letter was undated, but its contents show that it was sent shortly after the plaintiff and Bureau officials reached agreement. Mr. Jollie wrote that "[b]ecause government contracting procedures are quite complex it is conceivable that Mr. Kinzley will not receive his first draw before the third or fourth week of November."

According to the defendant's exhibits, the Bureau officials decided that Mr. Martin would arrange to employ the plaintiff by preparing and submitting a purchase order, "a process which he had used" with other personal service contracts. Sometime in October 1976, however, Mr. Martin went on extended sick leave and never processed the purchase order. To remedy this, Mr. Jollie prepared and submitted a requisition and a purchase order on December 1 and 2, 1976, respectively, to cover, at the agreed rate, the services the plaintiff had rendered and the expenses he had incurred up to that time. This payment for the period September 13 to November 30, 1976, was for $7,592.

The purchase order was approved after a meeting in December 1976, among the plaintiff, Mr. Jollie, Theodore Krenzly, Acting Deputy Commissioner of the Bureau, and members of Mr. Krenzly's staff. At this meeting, the participants agreed that such a purchase order was "both [a] legal and [an] appropriate" way to pay the plaintiff for services he had rendered. The Bureau officials at the meeting, however, wanted to use a different method in the future.

The Bureau sent the plaintiff a Treasury check for $7,592 on January 18, 1977.

In December 1976, after the meeting, Jose Zuni, Director of the Bureau's Office of Administration, assumed responsibility for the Program. In late December, he arranged to place the plaintiff in a temporary civil service position as a Program

Analyst for the Bureau at a GS–13, step 1, salary level. As originally arranged, the appointment was to begin December 27, 1976, and run for a month. It was later extended, however, through February 25, 1977. During this 2-month period, the plaintiff received $2,525.04 as salary.

Shortly before the expiration date of the plaintiff's extended temporary appointment, the Bureau's Acting Deputy Commissioner (Mr. Krenzly) informed the plaintiff that the Bureau would be unable to employ him further except by temporary employment at a GS–13 grade. When the plaintiff's appointment expired on February 25, 1977, however, the Bureau did not extend it further. The defendant concedes that the Bureau informed the plaintiff that his services were not needed after conclusion of the temporary appointment. The plaintiff performed no services for the Bureau thereafter.

On March 30, 1977, the plaintiff submitted a claim to the Acting Commissioner of Indian Affairs seeking damages for the breach of his contract by the Bureau. In evaluating this claim, the Interior Department's Acting Assistant Solicitor, on November 2, 1977, sent a memorandum to Mr. Jollie which stated that the plaintiff's "[d]iscussions" with Bureau officials had "culminated in a verbal agreement" for the plaintiff "to perform personal services for the BIA under the [interagency] Agreement for one year commencing in September 1976 at $2,500 per month plus additional payment for expenses."

On April 26, 1978, the Assistant Secretary for Indian Affairs rejected the plaintiff's claim except for $1,938.18 for the services the plaintiff had performed without compensation between December 1 and 26, 1976. The plaintiff rejected this offer and filed this suit.

---

**2.** It is therefore unnecessary for us to determine whether this section would prevent the enforcement of an express oral contract the existence and terms of which the defendant has admitted fully: *Narva Harris Constr. Corp. v. United States,* 216 Ct.Cl. 238, 243, 574 F.2d 508, 510 (1978), left the question open. *But see*

## II.

■ A. The defendant contends that the plaintiff's claim based upon his agreement with Bureau officials is unenforceable against the government because it is not supported by documentary evidence as 31 U.S.C. § 200(a) requires. That statute permits "no amount" to "be recorded as an obligation of" the United States

unless it is supported by documentary evidence of—

(1) a binding agreement in writing between the parties thereto, including Government agencies, in a manner and form and for a purpose authorized by law, executed before the expiration of the period of availability for obligation of the appropriation or fund concerned for specific goods to be delivered, real property to be purchased or leased, or work or services to be performed; or

. . . .

(7) employment or services of persons or expenses of travel in accord with law; or services performed by public utilities

. . . .

The plaintiff's claim satisfies those requirements.[2]

There are four documents that reflect and confirm the plaintiff's employment contract:

(i) The letter Mr. Jollie sent to the plaintiff's creditor, in early autumn 1976, which twice described the plaintiff's arrangement with the Bureau as an "agreement." The letter did not, as the defendant contends, suggest that the arrangements with the plaintiff were still tentative, but rather stated that the Bureau had "entered into an agreement with" the plaintiff, and described the provisions that "our agreement includes . . . ."

(ii) The requisition and purchase order which authorized payment to the plaintiff,

---

*United States v. American Renaissance Lines, Inc.,* 494 F.2d 1059, 1062 (D.C.Cir.), cert. denied, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974) ("contracts which are merely oral are not enforceable" by or against the government).

at the contract rate, for the services he already had rendered. They explained that the plaintiff was performing the services contemplated under the interagency agreement.

(iii) The November 2, 1977 memorandum of the Interior Department's Acting Assistant Solicitor which recognized there had been the very verbal agreement upon which the plaintiff relies and the existence of which the defendant has admitted.

(iv) The April 26, 1978 letter from the Assistant Secretary recognizing that the plaintiff was entitled to $1,938.18 "for uncompensated services ... under the oral agreement, which was in effect from September 13, 1976 to December 27, 1976."

These documents must be viewed against the background of the interagency agreement stating that the program it outlined would run for "one (1) year beginning October 1, 1976, and ending September 30, 1977" and that, to implement the program, the Bureau would "[d]esignate an Agreement coordinator before October 1, 1976 ...."

These four documents, perhaps individually and certainly together, constitute the "documentary evidence of ... employment ... of persons" that 31 U.S.C. § 200(a)(7) requires. They are written confirmation that the Bureau employed the plaintiff for the purpose and period and at the rate he alleges.

It is immaterial that none of these documents is a formal contract. In explaining the requirements of subsection (a)(1), which is more restrictive than subsection (a)(7) because it requires "a binding agreement in writing between the parties thereto," the House Conference Report stated that a "final form contract on [a] specified form" was not necessary. H.R.Rep.No.2663, 83rd Cong., 2d Sess. 18 (1954). As an example of a document that would meet the requirements of that subsection, the Report cited "a letter of intent accepted by a contractor, if sufficiently specific and definitive to show the purposes and scope of the contract finally to be executed ...." *Id.*

Furthermore, 31 U.S.C. § 200(a)(7), unlike subsection (a)(1), does not require that the "documentary evidence" be of "a binding agreement in writing between the parties," but only that it is "evidence of ... employment or services of persons ...."

In *United States v. American Renaissance Lines, Inc.,* 494 F.2d 1059 (D.C.Cir.), *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974), the court stated that although "the requirement of a writing" in 31 U.S.C. § 200(a)(1) "does not follow the typical statute of frauds format," it has the same purpose of protecting the parties "from the possibility of fraud or misinterpretation ...." *Id.* at 1062, 1063. Under the Restatement of Contracts,

> any writing, signed by or on behalf of the party to be charged, which ... identifies the [contract's] subject matter ... indicate[s] that a contract with respect thereto has been made between the parties, ... and ... states with reasonable certainty the essential terms of the unperformed promises in the contract

will render enforceable a contract subject to the requirements of a writing. Restatement (Second) of Contracts § 207 (Tent. Drafts Nos. 1–7, 1973). Similarly, under the Uniform Commercial Code, a contract subject to the requirement of a writing is enforceable if, as is the case here, "the party against whom enforcement is sought admits in his pleading, testimony, or otherwise in court that a contract ... was made ...." U.C.C. § 2–201(3)(b).

We therefore hold that 31 U.S.C. § 200(a) does not bar enforcement of this contract.

■ B. The defendant further contends that the plaintiff's contract is unenforceable because the Bureau officials did not follow the necessary procedures that would have authorized them to engage in noncompetitive negotiated procurement of personal services from the plaintiff. It relies on 41 U.S.C. § 252(c) and Interior Department procurement regulations.

That statute requires all government "purchases" and "contracts for property and services" to "be made by advertising," but permits "purchases and contracts" to

**192**

"be negotiated by the agency head without advertising if . . . for personal or professional services . . . ." The Interior Department procurement regulations in force at the time the agreement in this case was reached delegated this authority to certain "contracting officer positions . . . ." 41 C.F.R. § 14H–1.451 (1977).

These regulations specifically designated the Chief of the Indian Technical Assistance Center, Denver, Colorado, as a contracting officer authorized to enter into negotiated procurement of personal services. 41 C.F.R. § 14H–1.451–2(a)(1)(viii) (1977). Peter J. Martin held this position when he, along with other Bureau officials, negotiated with the plaintiff and reached the agreement for the plaintiff to serve as program coordinator. In later discussions with Bureau officials over the method by which his compensation would be paid, the plaintiff also dealt with two other designated contracting officers, the Acting Deputy Commissioner of the Bureau (Mr. Krenzly) and the Director of the Bureau's Office of Administration (Mr. Zuni). See 41 C.F.R. § 14H–1.451–2(a)(ii), (iii) (1977). It was Mr. Krenzly who agreed that the plaintiff should be paid by purchase order for the services he had rendered through November 1976.

The defendant contends that these officials could not have bound the government without first preparing a written "Justification for Noncompetitive Procurement" and a "Memorandum of Negotiations" which Interior Department regulations allegedly required them to do. See 41 C.F.R. §§ 14–3.-150 et seq. (1977). The cited regulations, however, only prescribe internal agency procedures. They do not restrict the ability of government officials otherwise authorized to engage in negotiated procurement. The memoranda they require are guidelines for the agency's own use which are kept in agency files. Contractors such as the plaintiff are not required to review those files to determine whether the officials with whom they deal have prepared the required internal documentation.

This is an entirely different case from the situation of a contractor who deals with a government employee who is entirely unauthorized to act as a contracting officer, see *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947), or the situation of a contract that itself is directly contrary to the procurement regulations, see *Yosemite Park v. United States*, 217 Ct.Cl. 360, 582 F.2d 552 (1978). If the Bureau had attempted to complete the paperwork that these regulations contemplate before hiring a contractor to act as program coordinator, it probably would have been unable to meet its commitment to HEW to designate a coordinator within the October 1, 1976 deadline the interagency agreement specified.

■ C. The government also argues that the contract is unenforceable because Bureau officials had no available method to pay the plaintiff the full contract price. It is highly doubtful whether this assertion, if factually correct, would warrant denying relief for breach of contract. In any event, its premise is unconvincing.

According to the defendant, the Bureau could not have used purchase orders to compensate the plaintiff fully under the contract, because the regulations limit the use of those orders to purchases of less than $10,000. Although the procurement regulations state that a purchase order form "is designed primarily . . . for small purchases not in excess of $10,000," 41 C.F.R. § 1–3.-605–2(a)(3) (1977), there is nothing in the regulations which would have prevented the use of those orders to compensate the plaintiff fully under the contract. Defendant also has offered no explanation why the temporary appointment that the plaintiff held for 2 months could not have been extended past the date on which it terminated, or why a GS–13 rate was the highest level at which the plaintiff could have been paid.

### III.

■ On the basis of the exhibits and affidavits offered in support of the parties' motions for summary judgment, we con-

clude that there exist disputed issues of material fact on the question whether the plaintiff modified the employment contract when he accepted the temporary position as Program Analyst for the Bureau, and therefore is now barred from asserting any rights under the contract after the date he accepted that position. We shall remand the case to the Trial Division for further proceedings on that issue.

## IV.

The plaintiff seeks as damages not only his $2,500 monthly salary under the agreement, but also "further" damages "deriving from the loss of valuable contractual rights, relinquished by the plaintiff in order to act as national coordinator of the Program ...." Any such further damages, however, resulted not from the defendant's breach of the contract, but from the plaintiff's accepting the employment in the first place.

If the government had performed the contract fully, the plaintiff still would have lost the identical "valuable contractual rights" he asserts he relinquished upon accepting the contract, but he could not have recovered for that loss. The damages the plaintiff may recover for breach of contract, whether measured by the original terms or by any modification that may be held to have occurred (see part III, *supra*), will provide proper compensation under the rule that "a party injured by the breach of a contract is entitled to be placed in the position [it] would have been had the promised performance been carried out ...." *Arizona v. United States*, 216 Ct.Cl. 221, 237, 575 F.2d 855, 864 (1978).

If a contract itself does not provide an ascertainable measure of damages or one that would fully compensate the plaintiff for the loss he has suffered from the breach, then an alternative theory of damages may be used, under which the plaintiff receives the benefits it relinquished in reliance upon the anticipated benefits under the contract. Restatement (Second) of Contracts § 363, Comment (a) (Tent. Draft No. 14, 1979). The plaintiff cannot properly

invoke that theory, however, since here the contract measure of damages will place him in the same position as if "the promised performance [had] been carried out ...." *Arizona, supra*. "[T]he plaintiff is entitled to recover the full measure of the bargain it made with the government .... Its entitlement is to be made whole for the damages it suffered from, but not to make a profit from, the breach." *Northern Helex Co. v. United States*, 225 Ct.Cl. ——, ——, 634 F.2d 557, 563 (1980).

We therefore shall grant the defendant's motion for summary judgment with respect to the plaintiff's claim for "further" damages.

## V.

The plaintiff also requests attorney's fees and the costs of this litigation. Attorney's fees may not be recovered against the United States unless an act of Congress specifically authorizes their allowance. *Nibali v. United States*, 225 Ct.Cl. ——, ——, 634 F.2d 494, 496 (1980). There is no statute now providing for their recovery in this case. *See* 28 U.S.C. § 2412 (1976).

It is possible, however, that under the Equal Access to Justice Act, Pub.L.No. 96–481, title II, 94 Stat. 2325 (1980) (to be codified in 28 U.S.C. § 2412), which is effective October 1, 1981, the plaintiff might be entitled to attorney's fees if he prevails in a decision rendered on or after that date. Of course, we express no opinion on that issue. In the circumstances, however, it would be inappropriate to grant summary judgment for the defendant on that issue.

As a matter of practice, this court has not awarded costs to either party, *Rasmussen v. United States*, 211 Ct.Cl. 260, 275 n.20, 543 F.2d 134, 142 n.20 (1976). Since there is nothing in the Equal Access to Justice Act altering this practice, we will grant summary judgment for the defendant on that issue.

## CONCLUSION

The defendant's motion for summary judgment is granted with respect to the

194

plaintiff's claims for damages "deriving from the loss of valuable contractual rights, relinquished by plaintiff in order to act as national coordinator of the [Indian Construction Companies] Program" and for costs of this litigation, and denied in all other respects. The plaintiff's cross-motion for partial summary judgment is granted with respect to his claim for damages for compensation under the agreement with the Bureau during the period December 1 to 24, 1976, and denied in all other respects.

The case is remanded to the Trial Division for further proceedings in accordance with this opinion.

