nel area, little was said about paragraph (g) in the available legislative history. In fact, the only reference to this paragraph is found in a letter from Phillip Young, Chairman, Civil Service Commission, to Congressman Tom Murray, Chairman of the House Committee on Post Office and Civil Service. Plaintiff argues that this correspondence demonstrates that the Commission had construed section 8332(g) as allowing all employees credit for military service in computing civil service annuities. While certain portions of Chairman Young's letter are unclear, we certainly find nothing therein which is sufficient to contravene the clear Congressional purpose evidenced throughout the legislative history of the original enactment of paragraph (g). Although Chairman Young made no direct reference to the narrow purpose of this provision, he alluded to it indirectly when, in describing the proposed limitation on paragraph (g), he stated:

> This provision would generally affect adversely only those persons who *do not* return to civilian duty. [emphasis supplied]

 In summary, we hold that the legislative history of paragraph (g), taken as a whole, demonstrates clearly that this provision was enacted for the specific purpose of counteracting the ruling of the Comptroller General regarding civilian retirement rights of employee-soldiers. Furthermore, we conclude that paragraph (g) was meant to aid only those Federal employees who left their civilian jobs during times of national emergency to enter military service and became so disabled or otherwise incapacitated that they were unable to return to civilian Government service.[7] Although we presume that Col. Bailey served his country with valor during World War II and the Korean Conflict, the simple fact is that he was able to return to civilian positions after both tours of duty.

Therefore, his military service did not qualify him for the benefits intended by paragraph (g), and his entitlement to retirement annuity is governed by the clear language of paragraph (c).

## IV

For the reasons stated, we find that the decision of the Board of Appeals and Review .was correct as a matter of law. Accordingly, we deny plaintiff's motion for summary judgment, grant defendant's cross motion for summary judgment, and dismiss plaintiff's petition.

**MEVA CORPORATION**

v.

**The UNITED STATES.**

No. 492–69.

United States Court of Claims.

Feb. 19, 1975.

---

7. It should be noted that this conclusion is in line with what the court has determined to be the scope of paragraph (g) in the past, when it has been confronted with other issues in

this area. *See* Nordstrom v. United States, 177 Ct.Cl. 818 (1966); Nordstrom v. United States, 342 F.2d 55, 169 Ct.Cl. 632 (1965).

Stuart G. Oles, Seattle, Wash., attorney of record, for plaintiff. Allen, DeGarmo & Leedy, Seattle, Wash., of counsel.

John A. McWhorter, Washington, D. C., for the Associated General Contractors of America, amicus curiae. Harold I. Rosen and King & King, Chartered, Washington, D. C., of counsel.

George M. Beasley, III, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant. David R. Schlee, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on exceptions by the plaintiff and the defendant to the recommended decision, filed January 11, 1974, by Trial Judge Harry E. Wood pursuant to Rule 134(h). The court has considered the case on the briefs and oral argument of counsel for the parties and the *Amicus Curiae*. Since the court agrees with the recommended decision of the trial judge, as supplemented by the court, and as hereinafter set forth, it hereby affirms and adopts the recommended decision, as supplemented, as the basis for its judgment in this case. Therefore, plaintiff is

entitled to recover and judgment is entered for plaintiff in the sum of $600,-000.

## OPINION OF TRIAL JUDGE

WOOD, Trial Judge:

In this contract action, plaintiff, a California corporation, contends that in the facts and circumstances of this cause defendant's refusal after contract award to permit plaintiff either (1) to substitute another subcontractor for one listed by plaintiff in its bid as the subcontractor who would (should plaintiff be awarded the contract) perform clearing and footings work, or (2) to perform the clearing and footings work itself, constituted a breach of contract, and that defendant is accordingly liable to it for its resulting damages, alleged to amount to some $1,600,000.

Defendant's position is that the Contracting Officer never rendered "a decision that was final as to the contractor's right to substitute"; that, assuming *arguendo* the Contracting Officer did make "an arbitrary and final decision", plaintiff's claim for resulting damages is nonetheless barred by estoppel or waiver; that in any event plaintiff's "total cost" approach to the problem of damages is deficient; and that, there being "no other competent proof of damages, plaintiff cannot recover." [1]

For the reasons which follow, it is concluded that plaintiff is entitled to recover, in the ámount of $600,000.

### I

Early in 1964, defendant, acting through the Bureau of Reclamation, Department of the Interior, issued an invitation for bids (IFB) for the construction and completion of a proposed "Flagstaff-Pinnacle Peak" 345-kilovolt transmission line running from near Winona, Arizona, to the Bureau of Reclamation's Pinnacle Peak Substation some 14 miles north of Scottsdale, Arizona. Bids were to be opened in Phoenix May 12, 1964.

The IFB indicated that the work to be performed (which included, *inter alia*, clearing and footings work) was to be divided into two schedules, each approximately 57 miles in length; that work should begin within 30 calendar days after the contractor's receipt of notice to proceed; and that all of the contract work should be completed within 630 days from the date of receipt of such notice. The IFB also included Special Condition 24, Specifications No. DC–6090, "Listings of Subcontractors", the genesis of this litigation.

Briefly, paragraph b of Special Condition 24 required that a bidder submit with his bid the firm name and address of each subcontractor to whom a subcontract would be awarded for each category of work listed in a "Supplement to Bid Form, S.F. 21—List of Subcontractors". Paragraph b further stated that, "Except as otherwise provided herein, the bidder agrees, if awarded the contract, not to contract to have any of the listed categories of work performed by any subcontractor other than the subcontractor named for the performance of such work." Special Condition 24 also provided in part as follows:

> e. No substitution for any named subcontractor will be permitted prior to award, and only in unusual situations after award and then only upon the contractor's submission, in writing, to the Contracting Officer of a complete justification therefor and after obtaining the Contracting Officer's written approval thereof. * * *

Mr. S. M. Rivers, who had become an employee of plaintiff on April 27, 1964, was responsible for the preparation of plaintiff's bid on the proposed transmission line. Despite his intent to subcontract the clearing and footings work, Mr. Rivers proceeded on his own to prepare a prime contract bid for plaintiff. He endeavored to obtain bids on the clearing and footings work, and as part of this effort solicited a bid from a Mr. Hal Perry, a Phoenix contractor doing busi-

---

1. Defendant's Brief, pp. 5, 12, 34.

ness as Sun States Contracting Company. Mr. Rivers received a bid from Sun States on the evening of May 11, 1964, the day before bid opening.

Perhaps because of the timing of the Sun States bid, plaintiff's prime contract bid to defendant did not reflect Sun States' bid figures on the clearing and footings work (a total of about $1,523,000), but instead contained Mr. Rivers' own higher bid figures for that work (a total of about $1,864,000).[2] In bidding on the proposed transmission line, Mr. Rivers, for plaintiff, did list Sun States (as "Sun States Construction Co.") as a subcontractor for both clearing and footings work pursuant to Special Condition 24, *supra*. At some time prior to coming to work for plaintiff, Mr. Rivers had checked Mr. Perry's "credit" and had found it to be "slow but good". No further pre-bid investigation of either Mr. Perry's or Sun States' financial situation was then made.

At bid opening May 12, 1964, plaintiff's bid of $6,148,581 on the proposed transmission line was within about $115,000 of defendant's engineer's estimate (of some $6,265,000), but was about $850,000 less than that of the next lowest bidder, a construction company which had just completed a parallel transmission line along the same right-of-way. Plaintiff was awarded a contract for construction of the Flagstaff-Pinnacle Peak 345-kilovolt transmission line, at an estimated price of some $6,133,000, June 5, 1964.

In the meantime, and following May 12, 1964, plaintiff had begun to investigate Sun States' financial situation. After an unsuccessful effort to obtain information from Mr. Perry, receipt, on May 20, 1964, of a financial report showing Mr. Perry's net worth to be rather small, and advice on June 9, 1964, from Sun States that it had secured a line of credit at a Phoenix bank (and from the bank that there was no such line of credit), two of plaintiff's representatives visited the Bureau of Reclamation's office

in Phoenix on June 9, 1964, to inquire about the possibility of substituting another contractor for Sun States (whose financial condition was then mentioned) or of doing the clearing and footings work itself.

During this same period of time, however, representatives of Sun States, in conversations with representatives of defendant in Phoenix, had made a number of allegations respecting plaintiff. Among other things, defendant was told that plaintiff was trying to "dump" Sun States, and that plaintiff was "bid shopping". The latter term describes a situation where, after bid opening and award, a successful government prime contract bidder who has utilized a particular potential subcontractor's bid figure in submitting its prime contract bid "shops" the subcontract work to other potential subcontractors in an effort either to obtain from another subcontractor a lower price for the work to be subcontracted or to drive down that of the subcontractor whose figures were used in computing the prime bid.

The Office of the Chief Engineer of the Bureau of Reclamation ("the Contracting Officer"), in Denver, Colorado, was promptly advised by his subordinates in Phoenix of the substance of Sun States' assertions about plaintiff, and of the comments and questions of plaintiff's representatives at the Bureau's Phoenix office on June 9, 1964.

On June 12, 1964, by letter to the Contracting Officer, plaintiff requested "permission to withdraw the name of the sub-contractor [Sun States] which we listed in our Bid Documents submitted May 12, 1964." Plaintiff's said letter further stated that:

> Our detailed examination of the financial resources of this Corporation reveals that, in our opinion, they are inadequate to support performance of this sub-contract. We have examined the Corporation's financial statement and the personal financial statements

---

**2.** Plaintiff's bid to defendant on the footings portion of the work was, however, some $145,000 less than Sun States' bid to plaintiff on that portion of the work.

of the Officers, have discussed this matter with the Sun States banking affiliate—The Valley National Bank, Mr. Norman J. Miles, Assistant Vice President, and have also obtained Dun and Bradstreet Reports. We believe that the satisfactory performance of this work covered by this sub-contract would be seriously affected by this lack of financial stability.

If approval is obtained for this withdrawal, we intend to provide a subcontractor or contractors of definite financial responsibility or will provide performance by our own organization.

By letter dated June 15, 1964, defendant gave plaintiff written confirmation of a telephonic postponement of a pre-construction conference scheduled for June 17, 1964, and advised plaintiff that the conference would be rescheduled when its request to withdraw Sun States had been resolved.

By letter dated June 17, 1964, from the Contracting Officer, plaintiff was advised in pertinent part that:

It appears that there has been no change in the circumstances existing at time of submittal of your bid to justify substitution of subcontractors as requested. Accordingly, approval of any substitution is denied.

While the Contracting Officer had concluded by June 17, 1964, that plaintiff might be "bid shopping", defendant's representatives made no effort, at any time during the period 1964–66, to ascertain whether or not Sun States' allegations with respect to plaintiff had any basis in fact. There is no credible evidence in the record of "bid shopping". Moreover, the proof establishes that plaintiff was never told by anyone, prior to 1967, that Mr. Rivers or plaintiff had supposedly made any pre-bid promises to Sun States with respect to financing or bonding, as Sun States was asserting to defendant in mid-1964.

On June 24, 1964, at plaintiff's request, a conference between representatives of plaintiff and the Contracting Officer (and other representatives of defendant) was held in Denver, Colorado.

The Contracting Officer was then told that plaintiff, having received Sun States' bid just prior to bid opening, had been unable to make a pre-bid appraisal of Sun States' capabilities, that Sun States had no financing and could not make bond, and that plaintiff wanted either to obtain a subcontractor with adequate financing to do the clearing and footings work or perhaps to do that work itself. A decision under Special Condition 24 was requested.

While plaintiff was then told that Sun States had approached defendant in opposition to any possible substitution for Sun States by another subcontractor (or by plaintiff), none of Sun States' assertions to defendant about plaintiff (and one of those assertions, of pre-bid promises with respect to financing and bonding, at least tended to confirm Sun States' financial instability) were even mentioned. The Contracting Officer reiterated that, absent a showing of some change in Sun States' circumstances following bid opening, any substitution for Sun States was unjustifiable, and that plaintiff's doing the work itself "would be considered a substitution."

In consequence of that position, plaintiff did not give the Contracting Officer documents respecting Sun States' financial condition it then had, and to which its June 12, 1964 letter to the Contracting Officer had referred. Had plaintiff done so, however, it would have made no difference. Even with clear proof of Sun States' insolvency in June 1964, the Contracting Officer would have denied plaintiff's request had Sun States been equally insolvent May 12, 1964, since only a postbid change in circumstances was, in his judgment, an "unusual" situation within the meaning of Special Condition 24.

Thereafter plaintiff entered into negotiations with Sun States with a view to reaching a subcontract with Sun States, and it eventually did so July 15, 1964. Two days later, on July 17, 1964, the Contracting Officer gave plaintiff notice to proceed with the work covered by the contract in suit.

In the meantime, on July 9, 1964, plaintiff had written to the Contracting Officer to advise that subcontract negotiations with Sun States were in process, but that, should they fail, the Contracting Officer would probably receive a request for reconsideration of his denial of plaintiff's request to "substitute the proposed subcontractor, or that the work be performed by ourselves." In the latter connection, plaintiff asked for an interpretation of the language of Special Condition 24 relating to substitution of subcontractors as it pertained to work performed by a prime contractor.

The Contracting Officer's response, some days after a pre-construction conference attended by representatives of plaintiff, Sun States, and defendant had been held, was in substance that plaintiff was precluded by Special Condition 24 from doing the clearing and footings work, and that if plaintiff should decide not to enter into a subcontract with Sun States, and instead request approval "for substitution of yourself as prime contractor for work previously listed for performance by that subcontractor, I will be glad to give you a formal and final decision on the matter upon request being made therefor."

Sun States subcontracted the clearing work, at a price of $210,000,[3] and that work was completed without any apparent difficulty or delay. The footings work, however, did not proceed so well.

For liability purposes, it suffices to say that Sun States never achieved the required production rate of 10 miles of footings work per month, in fact completing no more than 10 miles of footings work during the period August–December 1964. The basic reason for Sun States' failure to make progress was a lack of financial capability and resources, i. e., it did not have enough personnel, equipment, or material on the project to do the footings work at the required rate of progress.

By agreement dated December 23, 1964, between plaintiff and Sun States, the subcontract between the two was terminated effective December 31, 1964. Sometime in January 1965 defendant was orally advised of the termination agreement, and made no objection either to that agreement or to plaintiff's intent to complete the footings work itself. Plaintiff completed the subcontract work in 1965.

Plaintiff contends that defendant's refusal to permit it to substitute either another subcontractor, or itself, for Sun States constituted a breach of contract entitling plaintiff to recover for any damages thereby caused, on the grounds (1) that having shown an "unusual" situation constituting a "complete justification therefor * * *", it was entitled, pursuant to Special Condition 24, to replace Sun States; (2) that the Contracting Officer acted arbitrarily and capriciously, and under the influence of "bid shopping" charges, in denying its requests to substitute for Sun States, neither informing plaintiff of those charges nor affording it an opportunity to respond to them; (3) that by compelling plaintiff to subcontract with Sun States, defendant breached its implied obligation not to hinder plaintiff, or to render its performance more costly; and (4) that defendant's refusal to permit plaintiff to do the work itself was in any event a breach of contract.[4]

■ Defendant argues, however, that the Contracting Officer "never rendered a decision that was final as to the contractor's right to substitute";[5] that plaintiff subcontracted with Sun States without any "force, compulsion, or duress by the Contracting Officer"; and

---

**3.** Plaintiff's bid price to defendant on the clearing work was $920,000; Sun States' bid price to plaintiff on the clearing work was $435,000.

**4.** Plaintiff candidly disclaims any challenge to the Contracting Officer's integrity, asserting

rather that his actions and judgments in the matter failed to comport with his contractual obligations to plaintiff.

**5.** Defendant's Brief p. 5.

that, if the union between the two were unwilling to any degree, the cause was pressures by Sun States on, and concessions from Sun States to, plaintiff, with defendant playing no part in the matter. Defendant's view of the facts leading to plaintiff's subcontract with Sun States is not a tenable one.

Winter work on the northern half of the proposed transmission line, in northern Arizona, is, because of altitude and terrain, virtually impossible. Plaintiff had therefore originally planned to commence clearing and footings work on the northern end of the project in mid-June 1964, and to proceed south without interruption, completing these portions of the work in about a year.

When plaintiff notified defendant on June 12, 1964, of its desire to "withdraw" Sun States, defendant immediately postponed a preconstruction conference scheduled for June 17, 1964. Moreover, that request, albeit not the only factor, clearly affected the timing of defendant's issuance of a notice to plaintiff to proceed with the contract work on July 17, 1964, two days after plaintiff's agreement with Sun States.

In the period of time between June 12 and July 17, 1964, the Contracting Officer twice denied plaintiff's request for approval of substitution on the ground that to obtain his approval plaintiff would have to show some change in Sun States' circumstances after bid opening. There was neither a reservation of decision pending presentation of further facts, nor anything tentative about these rulings. In all the circumstances then facing plaintiff, it reasonably concluded that it had no choice but to proceed as it did by way of a subcontract with Sun States, on terms as favorable to plaintiff as it could obtain.

Defendant's reliance on plaintiff's July 9, 1964 letter to the Contracting Officer as showing that the matter of substitution remained unresolved after June 24, 1964, fails. In that letter, plaintiff, recognizing the Contracting Officer's position, simply advised him that it was proceeding as his decision required, but that

it might again request reconsideration should it be unable to comply with that decision. Nothing therein detracts from the finality of the Contracting Officer's earlier rulings.

Thus, plaintiff's contention of breach of contract by defendant's refusal to permit it to substitute either another subcontractor or itself for Sun States may not be finessed on the ground that plaintiff's dealings with Sun States were the product of choice, untainted by a final decision of the Contracting Officer denying plaintiff's request for substitution.

■ It is, of course, apparent that Special Condition 24, to which plaintiff agreed in submitting its bid, vested in the Contracting Officer a considerable measure of discretion. That discretion, however, was not, and cannot have been intended to be, absolute. See General Electric Co. v. United States, 440 F.2d 420, 194 Ct.Cl. 678 (1971); Argonaut Insurance Co. v. United States, 434 F.2d 1362, 193 Ct.Cl. 483 (1970). And, it is clear from the record in this case that that discretion was exercised arbitrarily, capriciously, and in breach of the Contracting Officer's obligations to plaintiff. General Electric Co. v. United States, *supra*; see also Hardeman-Monier-Hutcherson v. United States, 458 F.2d 1364, 1371–72, 198 Ct.Cl. 472, 487 (1972); Penner Installation Corp. v. United States, 89 F.Supp. 545, 116 Ct.Cl. 550, aff'd 340 U.S. 898, 71 S.Ct. 278, 95 L.Ed. 651 (1950).

While plaintiff did receive one other bid on a portion of the footings work, Sun States was the sole bidder to plaintiff on the clearing and footings portion of the proposed contract work. Sun States' bid reached plaintiff on the evening before bid opening. There was obviously little or no time for any investigation of Sun States by plaintiff. Even its corporate name was inaccurately listed in plaintiff's bid documents, and plaintiff's, not Sun States', bid prices for clearing and footings work were used.

When, shortly after bid opening, plaintiff came to the conclusion that Sun States lacked adequate financial re-

sources to perform a subcontract for the clearing and footings work—a conclusion which the events of the following several months proved devastatingly accurate— it twice sought the Contracting Officer's permission, on this ground, to substitute someone else for Sun States. Sun States' allegations to defendant of promises by plaintiff as to bonding and financing bore out Sun States' own financial instability.

The Contracting Officer knew, or should have known, that Sun States was at least a risk. Notwithstanding, he neither advised plaintiff of Sun States' allegations to defendant about plaintiff, and thereby in effect denied plaintiff an opportunity to refute them, nor even tried to find out whether those allegations had any basis in fact. Perhaps influenced by alleged (but clearly not proven) bid shopping, he simply insisted that a post-bid change in circumstances must be shown to obtain his approval for substitution pursuant to Special Condition 24.

■ In all of the facts and circumstances of this cause, the Contracting Officer acted arbitrarily and capriciously, and in breach of his contractual obligations to plaintiff, in thus denying plaintiff's requests for substitution. See General Electric Co. v. United States, *supra*; Argonaut Insurance Co. v. United States, *supra*; Penner Installation Corp. v. United States, *supra*.

Plaintiff also vigorously urges that by compelling plaintiff to subcontract with an incapable subcontractor, defendant violated its implied obligation not to hinder plaintiff, nor to render its performance more costly. *Cf.* Space Corp. v. United States, 470 F.2d 536, 541, 200 Ct.Cl. 1, 10 (1972); Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 700 (1964); Commerce International Co. v. United States, 338 F.2d 81, 85, 167 Ct.Cl. 529, 536 (1964). Except for denying that the Contracting Officer rendered a final de-

cision requiring plaintiff to subcontract with Sun States, defendant does not really controvert this argument. In view of the conclusions hereinabove set forth, however, the issue need not be, and is not, here reached.

Defendant does contend that, should the court conclude that the Contracting Officer did render a final and arbitrary decision, the claim herein is nonetheless barred by the doctrines of estoppel or waiver. These contentions have no merit.

■ One argument is that by its letter of July 9, 1964, plaintiff somehow lulled the Contracting Officer into believing that plaintiff no longer sought to submit facts necessary to justify a final decision in its favor. This is specious. The Contracting Officer had twice told plaintiff that only a post-bid change in circumstances would be considered. Plaintiff obviously could not make such a showing, and it had in effect told the Contracting Officer just that. The notion that plaintiff somehow lulled or misled defendant lacks any foundation.[5a]

Defendant also urges that by failing to advise it that plaintiff was contracting with Sun States under protest or disagreed with the Contracting Officer's decision, and by failing to go over the Contracting Officer's head administratively, in 1964, plaintiff is "estopped, by acquiescence or otherwise, from basing a claim upon the actions or inactions of the Contracting Officer."[6]

■ Plaintiff's June 24, 1964, request for reconsideration was itself clearly sufficient to show the Contracting Officer that plaintiff protested, and disagreed with, his decision. Moreover, the Contracting Officer knew, or should have known from what Sun States and plaintiff had both told him, that withholding approval for substitution might well result in a claim. The proposition that

---

**5a.** Plaintiff was then proceeding on the assumption that the controversy could well be one arising "under the contract" which would be remedied administratively. On that assumption, the disputes clause required that

the contractor proceed as the Government directed, pending resolution of the dispute. [footnote by the court]

**6.** Defendant's Brief, p. 19.

plaintiff's failure to "appeal" is a bar is supported neither by authority nor logic.

Defendant further asserts that plaintiff acquiesced in "the Contracting Officer's position that, where the subcontractor was alleging prebid understandings concerning financing of the subcontract work, the complete facts surrounding such understandings must be brought out before substitution on the ground of 'financial instability.' "[7] This position falls, on the facts found.

Finally, Harvey Radio Laboratories, Inc. v. United States, 115 F.Supp. 444, 126 Ct.Cl. 383 (1953), cert. denied, 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425 (1954), and Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630, 201 Ct.Cl. 135 (1973), cited by defendant as controlling on the estoppel question, are, on this record, wholly inapposite. *Cf.* Petrofsky v. United States, 488 F.2d 1394, 203 Ct.Cl. 347 (1973). No sound reason for invoking the doctrine is suggested, or appears.

■ Defendant also avers that waiver should be applied, asserting that the "law requires a contractor who claims the Government has committed a material breach of the contract to give prompt notice of such claim, and to state that it is continuing performance under protest if it elects to preserve its remedy."[8] As plaintiff correctly notes, 5 Williston on Contracts § 688 (3d ed.), cited by defendant in support of this proposition, pertains to loss of an excuse for nonperformance, and has no relevance to the situation here present. See Restatement of Contracts, § 410; 5A Corbin on Contracts § 1244.

In sum, plaintiff protested the Contracting Officer's initial ruling, without success. After denial of that protest, it proceeded, as it was entitled (indeed, as plaintiff reasonably concluded, required) to proceed, by dealing with Sun States as best it could.

While defendant suggests that it relied to its detriment on plaintiff's failure to continue to protest, the record is very clear that throughout 1964 defendant was, or at the very least should have been, aware of Sun States' performance (or, more accurately, lack of performance), and of the fact that Sun States was on the job only over plaintiff's protest. If, in these premises, defendant failed to protect itself, the blame must ultimately lie at defendant's, and not plaintiff's, doorstep.

Defendant's speculations that the Contracting Officer might have either terminated the contract or made a full investigation (the latter something he should have done in any event) had plaintiff persisted even further than it did, or that defendant might have kept more detailed records of plaintiff's and Sun States' performance, furnish no basis for any different conclusion. Plaintiff's claim is in no way barred by the doctrines of waiver or estoppel.

## II

Having concluded that plaintiff is entitled to recover from defendant its damages attributable to defendant's breach of contract, the difficult issues relating to the extent of such damages remain to be considered.

It is undisputed that plaintiff's "total costs" of performing the clearing and footings work were either $2,539,505 (utilizing AGC equipment costs in the computation) or $2,448,938 (utilizing booked equipment costs in the computation).[9] There, however, agreement ceases.

7. Defendant's Brief, p. 20.

8. Defendant's Brief, pp. 19–20.

9. See finding 19, n. 9. Plaintiff says that using AGC costs the total was actually $2,522,396, but this error in equipment costs (if it be one) does not work to plaintiff's advantage and is immaterial to the disposition of the case since the trial judge and we both use booked equipment costs in assessing damages. The record shows that the total figure of $2,448,938 utilizing booked equipment costs is not dependent on the AGC equipment costs but was in effect arrived at independently of those AGC costs. [footnote by the court]

Plaintiff would remove from either of the above sums what it asserts are its clearing costs, utilizing for this purpose the sum of $210,000 for which Mr. Bonner, Sun States' sub-subcontractor, actually performed the clearing work. To each of the resulting net figures, plaintiff would then add 3 percent, as "Unbilled Corporate Charges", and a profit factor of 5.37 percent. The resulting sums (i. e., adjusted "total costs", with and without AGC equipment costs) are, respectively $2,509,669 and $2,429,994.

From each of these two figures, plaintiff would then subtract either (1) its revenues from the footings portion of the contract work ($1,032,028) or (2) "Average Unit Bids, 2nd, 3rd, & 4th Bidders w/10.0% Profit Removed (Assumed Included)" ($1,230,920). Plaintiff has also proffered a number of other alternative calculations, reflecting a variety of assumptions. Plaintiff's several damage calculations in evidence vary, from a high of $1,609,314 (in its initial claim summary) to a low of $1,075,186, depending on the assumptions on which a particular calculation is based. All of the calculations have in common, however, the factual premises that plaintiff's "total costs" were reasonable, and that none of its excess costs in connection with the footings work were attributable to plaintiff.

Defendant objects generally to all of plaintiff's calculations of damages, vigorously contending that a "total cost" approach is improper, but adding that in any event plaintiff has erred (1) in utilizing AGC equipment costs, rather than available booked equipment costs, (2) in utilizing a "fictional" 3 percent unbilled corporate charges factor, (3) in utilizing plaintiff's own, unreasonably low, bid figures for footings work in calculating its damages, (4) in failing to average "all of the other items with the Government estimate * * *", (5) in adding a profit factor to plaintiff's costs, rather than deducting a profit factor from plaintiff's (or an averaged) bid figure for footings work, (6) in failing to recognize that

plaintiff's costs were unreasonable, thus requiring "some 'jury verdict' reduction * * *" in the costs claimed, and (7) in failing to take into account "the average clearing item bid * * *" or, at the least, $435,000, Sun States' bid price to plaintiff for the clearing work, in removing the clearing work from the calculation.[10]

■ Plaintiff's theory of the claim "has never been favored by the court and has been tolerated only when no other mode was available and when the reliability of the supporting evidence was fully substantiated." WRB Corp. v. United States, 183 Ct.Cl. 409, 426 (1968). See also Seger v. United States, 469 F.2d 292, 304, 199 Ct.Cl. 766, 786 (1972); Law v. United States, 195 Ct.Cl. 370, 381–87 (1971); Boyajian v. United States, 423 F.2d 1231, 1234–44, 191 Ct.Cl. 233, 238–55 (1970). As defendant asserts, that theory may not properly be invoked here. Plaintiff's low bid aside, the record precludes a finding that all of plaintiff's costs were reasonable, or that "it was not responsible for the added expenses." WRB Corp. v. United States, *supra.*

■ It is equally clear, however, that plaintiff suffered substantial monetary damage in direct consequence of defendant's breach of contract. And, an examination of the record shows it to be sufficient to permit the ascertainment by way of "jury verdict", with a reasonable degree of accuracy, of the extent of such damages. Law v. United States, *supra,* 195 Ct.Cl. at 386–87; Boyajian v. United States, *supra,* 423 F.2d at 1244, 191 Ct.Cl. at 254; WRB Corp. v. United States, *supra,* 183 Ct.Cl. at 425–27. In the circumstances, plaintiff's claim does not fail for lack of proof.

Implicit in any "jury verdict", however, is the necessity for resolution of the conflicting claims of the parties as to several factors to be weighed in reaching such a verdict: whether AGC or booked equipment costs are to be considered; the propriety of considering unbilled cor-

***

10. Defendant's Objections to Plaintiff's Requested Findings of Fact.

porate charges (and a profit factor) *vel non*; and the appropriate method of viewing plaintiff's clearing costs herein.

 Actual, booked equipment costs being available, AGC equipment costs may not be considered in assessing plaintiff's damages. Bennett v. United States, 371 F.2d 859, 178 Ct.Cl. 61 (1967); L. L. Hall Constr. Co. v. United States, 379 F.2d 559, 177 Ct.Cl. 870 (1966).[10a] A reasonable overhead factor may be taken into account in the assessment process, however, and plaintiff has proven that the 3 percent factor plaintiff would apply to its "total costs" is within the zone of reasonableness. Bennett v. United States, *supra*; Luria Bros. & Co. v. United States, 369 F.2d 701, 177 Ct.Cl. 676 (1966).

 A profit factor, on the other hand, may not be taken into account in reaching a "jury verdict" herein. Bennett v. United States, *supra*, and cases there cited. Too, plaintiff's attempt to remove clearing work from its "total costs" by subtraction therefrom of Sun States' sub-subcontract price of $210,000, rather than its own contract price of $435,000, fails. The record shows that the sub-subcontractor did the clearing work without difficulty or delay, and fails to show that plaintiff's cost for that work should be equated with Sun States', rather than its own.

 Upon the basis of a careful weighing of the record as a whole, including plaintiff's actual costs of performing the clearing and footings work; the factors enumerated in the preceding two paragraphs, as there indicated; defendant's estimate of the cost of the clearing and footings work, and all bids

on that work opened May 12, 1964; the differences between the said bids (in terms of bid items) and the as-built footings work; and the fact that a definite, if not precisely measurable, part of plaintiff's costs in performing the footings work cannot fairly be charged to defendant in any event, it is found by way of "jury verdict" that plaintiff was damaged by defendant's breach of contract in the amount of $600,000. *Cf.* Teitelbaum v. United States, 458 F.2d 72, 81, 198 Ct.Cl. 150, 165 (1972); WRB Corp. v. United States, *supra*, 183 Ct.Cl. at 425.

### Application of RICHARDSON INK COMPANY.

**Patent Appeal Nos. 74–609, 74–610.**

United States Court of Customs and Patent Appeals.

March 6, 1975.

---

**10a.** In the absence of a regulation or directive such as in Nolan Brothers, Inc. v. United States, 437 F.2d 1371, 194 Ct.Cl. 1 (1971), the burden is on the party seeking to substitute AGC costs for the contractor's own actual, booked costs to demonstrate that the contractor's own costs (as shown) are inadequate or incomplete or do not fairly represent the full costs rightly attributable to the particular contract. In this case, plaintiff did not succeed in bearing that burden; its effort to

invoke AGC costs consisted mainly of general testimony as to the normal practice of building contractors, not criticism directed specifically to the $2,448,938 of costs calculated from its own actual, booked equipment costs in this particular instance. The plaintiff has simply failed to prove that in this case actual, booked costs are inadequate or incomplete or do not represent the full costs rightly attributable to the contract. [footnote by the court]