**HOLLOWAY CONSTRUCTION COMPANY, Holloway Sand & Gravel Co., Inc. Holloway Sand & Gravel Trucking Corp., a Joint Venture**

v.

**The UNITED STATES.**

No. 535–80C.

United States Claims Court.

March 26, 1984.

Carl F. Schier, Birmingham, Mich., for plaintiff. Schier & Deneweth, Birmingham, Mich., of counsel.

Sandra P. Spooner, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant. Mary J. Cleaver, U.S. Corps of Engineers, Washington, D.C., of counsel.

## OPINION

MEROW, Judge:

In 1975 plaintiffs contracted with the United States Corps of Engineers (Corps) to construct earthwork on a flood control project at Bear Creek Lake, Colorado. In this litigation plaintiffs seek additional compensation stemming from actions taken by the Corps in August 1978 which postponed the concluding work on the project by plaintiffs until October 1978. Both parties have moved for summary judgment.

### Background

Plaintiffs' $27,254,543 fixed-price contract with the Corps of Engineers for the Bear Creek Lake earthwork project contained a "Suspension of Work" clause which provided (in part):

(a) The Contracting Officer may order the Contractor in writing to suspend, delay, or interrupt all or any part of the work for such period of time as he may determine to be appropriate for the convenience of the Government.

(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed or interrupted by an act of the Contracting Officer in the administration of this contract, or by his failure to act within the time specified in this contract (or if no time is specified, within a reasonable time), an adjustment shall be made for

any increase in the cost of performance of this contract (excluding profit) necessarily caused by such unreasonable suspension, delay, or interruption and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent (1) that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor or (2) for which an equitable adjustment is provided for or excluded under any other provision of this contract.

The Bear Creek Lake contract also contained a "Funds Available For Payment" clause which provided (in part):

1A–17.5 It is expected that, during subsequent fiscal years over the period of this contract, Congress will make additional appropriations for expenditure on work under this contract. The Contracting Officer will notify the Contractor of any additional allocation of funds to this contract when such funds become available. It is understood and agreed that the Government is in no case liable for damages in connection with the contract on account of delay in payments to the Contractor due to lack of available funds. Should it become apparent to the Contracting Officer that the available funds will be exhausted before additional funds can be made available, the Contracting Officer will give at least 30 days written notice to the Contractor that the work may be suspended. If the Contractor so elects, after receipt of such notice, he may continue work under the conditions and restrictions under the specifications, so long as there are funds for inspection and superintendence, with the understanding, however, that no payment will be made for such work unless additional funds shall become available in sufficient amount. When funds again become available, the Contractor will be notified accordingly. Should work be thus suspended, additional time for completion will be allowed equal to the period during which work is necessarily so suspended,

as determined by the dates specified in the above-mentioned notices.

\* \* \* \* \* \*

1A–17.8 Should Congress fail to provide additional funds the contract may be terminated and considered to be completed, at the option of the Contractor, without prejudice to him or liability to the Government, at any time subsequent to 30 days after payments are discontinued, or at any time subsequent to 30 days after the passage of the Act which would have but did not carry an appropriation for continuing the work or after the adjournment of the Congress which failed to make the necessary appropriations. However, if the funds cited in the contract are enough to extend the work beyond the end of the fiscal year and no new funds are allocated to this contract for the ensuing fiscal year, the Contractor must first exhaust all the cited funds and thereafter he may, at his option, exercise the rights provided in this paragraph any time after payments are discontinued.

From June 1975 until August 18, 1978, work on the Bear Creek project proceeded expeditiously. Ninety-six percent of the work had been completed and the project was one year ahead of schedule.

On August 19, 1978 the Corps' contracting officer, Colonel J.W. Ray, sent a telegram to plaintiffs, stating, in part:

Funds for the Bear Creek Lake, CO project will be exhausted before additional funds can be made available. Therefore, in accordance with paragraph 1A–17 of your contract this is your 30 day notice of exhaustion of funds. Letter will follow.

On August 23, 1978 Colonel Ray telegraphed plaintiffs as follows:

Additional funds for your Bear Creek, Colorado project are not available. Congress has appropriated sufficient funds (P.L. 95–96) to provide payment during FY78; however, the amount authorized for expenditure in the South Platte River Basin Monetary Authorization (P.L. 95–

189) does not allow further payment. Action is pending before the Public Works Committee of Congress to increase this authorization. Since congressional and presidential action are required, I cannot anticipate when additional funds will become available.

I hereby direct that all work under referenced contract cease immediately.

A further telegram dated August 24, 1978 from Colonel Ray stated:

Further reference my message directing that contract work cease and recent telecons with Mr. Holloway.

You have exhausted funds obligated to your contract as of this date. You are required to suspend all activities on your contract. The Corps of Engineers will not authorize or permit any further work on this contract until appropriate legislative relief is obtained. The Congress has under consideration measures which would provide additional authorization. You will be informed immediately upon enactment of any of these measures.

By letter dated August 31, 1978 Colonel Ray notified plaintiffs that "funds available for payment of your contract have been increased from $25,900,000 to $26,082,-614.04 to cover your estimated costs through 24 August 1978."

Following the letter of August 31, 1978, Daniel Holloway, an officer of the contractor, requested permission to continue work and complete the project, payment for such work to be contingent upon the availability of funds. This request was denied by the contracting officer and plaintiffs then suspended operations and demobilized their equipment and crews. However, at the request of the contracting officer, plaintiffs maintained some equipment and personnel at the work site on a standby basis.

On October 18, 1978 Colonel Ray telegraphed plaintiffs as follows:

Funds are now available. You are directed to proceed with all contract work. Furnish all delay costs as soon as possible. Funds available for payment of your contract have been increased from 26,082,614.04 dollars to 27,054,000.00 dollars.

At the request of the contractor, a meeting was held on October 24, 1978 in Colorado, attended by representatives of the Corps of Engineers, including Colonel Ray, and representatives of the contractor, including Daniel Holloway. A further meeting was held in Omaha, Nebraska on October 25, 1978 and a telephone conference was held on October 26, 1978. On the submissions of record, it appears that there exist disputes as to what was agreed at these meetings, but solely for the purpose of a ruling on defendant's motion for summary judgment, defendant does not dispute plaintiffs' assertions as to the agreements reached.

Accordingly, plaintiffs assert that at the cited meetings the contractor refused to return to work unless agreement was reached as to the terms for payment to the contractor for suspension period costs and for costs during the completion period. The contractor based this refusal on the option set forth in the funds available for payment clause to consider the contract terminated. If work was to continue, the contractor also stated that equipment costs would have to be paid at rates established by prior agreement and applied in prior modifications.

Plaintiffs then assert that an essentially oral agreement was reached with Colonel Ray as follows:

(a) That the Government would pay a profit to the Contractor on work completed after the suspension had been lifted in the amount of 10% of the added cost to complete the work.

(b) That no profit would be paid on costs incurred during the period of suspension.

(c) That the Government would reimburse the Contractor for the costs of equipment idle on the job during the period of suspension at a rate equal to one-half of an agreed upon equipment ownership rate, which rate had been agreed to and applied by the parties in connection with previous modifications during the prosecution of the contract prior to the suspension of work.

(d) That the Government would reimburse the Contractor for equipment costs incurred after the resumption of work, by the amount that such costs exceeded equipment costs anticipated by the Contractors at the time that the bid was prepared, such reimbursement to be at an agreed upon equipment ownership rate, which rate had been agreed to and applied by the parties in connection with previous modifications during the prosecution of the contract prior to the suspension of work.

(e) That the Government would reimburse the Contractor for all costs incurred by the Contractors for equipment idled by weather, after the resumption of work, at one-half the agreed upon equipment ownership rate, which rate had been agreed to and applied by the parties in connection with previous modifications during the prosecution of the contract prior to the suspension of work.

(f) That the Government would reimburse the Contractor for "show-up" costs incurred for labor after the resumption of work.

(g) That the Government would reimburse the Contractor for increased costs for labor due to inefficiency after the resumption of work.

(h) That the Government would reimburse the Contractor for all increased costs of labor due to the suspension of work.

(i) That the Government would reimburse the Contractor for the additional job site overhead costs incurred by the Contractor as a result of the suspension of work, whether such costs were incurred during the period of suspension or after the resumption of work.

(j) That the Government would reimburse the Contractor all increased costs incurred by the Contractors or their subcontractors for materials or for subcontractor claims as a result of the suspension of work.

Commencing on October 30, 1978 plaintiffs were able to resume operations. Because work had not progressed since August 24, 1978, to complete the contract it was necessary for plaintiffs to work during the winter months at reduced efficiency and with standby periods caused by adverse weather and site conditions.

By a letter dated November 1, 1978 plaintiffs submitted a claim for additional costs during the suspension period of August 24, 1978-October 27, 1978. The letter stated as follows (in part):

On September 5, 1978 we placed you on notice that we anticipated increased costs as a result of the suspension of all production operations for this project. This suspension has now been lifted and on October 30, 1978 we were able to resume limited operations. These production operations will be accelerated as quickly as the various associated construction procedures will allow.

This two month delay of construction will have a substantial impact upon our completion of the project. The loss of September and October will now force our operations into the winter months with a decreased production efficiency and a corresponding increase in costs. We now estimate it will be June 1, 1979 before we can complete the work which had been scheduled for a November 1, 1978 completion.

It is our understanding the actual cost of the suspension will be covered in one modification to be processed now and the impact costs associated with the delay of the project will be covered under a second modification when these costs can be determined.

We have completed our evaluation of the costs incurred during the suspension of work between August 24, 1978 and October 27, 1978. We determine the cost of this suspension amounts to $749,511.42 as itemized below:

| | |
|---|---|
| Labor Cost (See EXHIBIT "A") | $102,994.52 |
| Equipment Standby Cost (See EXHIBIT "B") | 609,949.12 |
| Miscellaneous Expense (EXHIBIT "C") | 3,169.47 |
| SUB TOTAL | $716,113.11 |
| Plus General Administrative Expense @ 4% | 28,644.52 |
| SUB TOTAL | $744,757.63 |
| Plus Bond Cost @ .006383 | 4,753.79 |
| TOTAL CLAIM | $749,511.42 |

\* \* \* \* \* \*

In our Equipment Standby Cost submittal labeled EXHIBIT "B" we have established the equipment standby rental rate as one half of the rental rate determined using a modified application of the 1966 Edition of the Associated General Contractors of American manual entitled Contractors Equipment Ownership Expense. The modification we have applied is to use a ten per cent figure for interest on the investment. This approach has been accepted in numerous government audits.

Because the amount of the claim exceeded $100,000, the applicable regulations required an audit by the government. Pending the audit results and a supplemental order adjusting the contract price, on November 18, 1978 the Corps issued a modification (No. P00033) to the Bear Creek Lake contract providing an interim payment of $700,000 to plaintiffs. The modification stated that "the contractor shall be reimbursed for costs incurred due to the suspension of work order dated 24 August 1978."

On March 12, 1979 the audit of plaintiffs' $749,511.42 claim was completed. The audit produced the following results:

| | Contractor's Proposal | Costs Per Audit |
|---|---|---|
| Direct Labor | $102,994.52 | $ 56,819.67 |
| Miscellaneous Expense | 3,169.47 | 3,169.47 |
| Equipment Costs | 609,949.12 | 356,635.36 |
| Subtotal | $716,133.11* | $416,624.50 |
| Home Office G&A | 28,644.52 | 2,621.53 |
| Subtotal | $744,757.52** | $419,246.03 |
| Bond Costs | 4,753.79 | 2,680.24 |
| Total Price | $749,511.42 | $421,926.27 |

\* $716,133.11 should be $716,113.11

\*\* $744,752.52 should be $744,757.63

With respect to equipment costs, the audit report explained the results obtained as follows:

*Equipment Costs:* The auditors reviewed acquisition costs for all major items of equipment at the project site during the period of suspension. Hourly ownership rates were then computed using the "Contractors' Equipment Ownership Expense" Sixth Edition 1966, published by the Associated General Contractors of America (Schedule A–2).

The Equipment Costs were then computed at 50% of the hourly ownership rate times the number of hours on the project site as determined by a listing provided by the Rocky Mountain Area. The costs were developed as follows:

| | |
|---|---|
| Total Proposed Costs | $609,949.12 |
| Costs Per Audit | 356,635.36 |
| Unsupported Costs | $253,313.76 |

As a result of the audit conclusions the Corps, on April 25, 1979, issued supplement No. 1 to modification No. P00033, taking a credit of $265,038.20, thereby reducing the interim payment to plaintiffs on the suspension period claim to $434,961.80.

In addition to the claim for costs incurred during the August-October 1978 suspension period, plaintiffs also incurred additional costs while completing the project. This was because the suspension caused the concluding work to be performed during periods of adverse winter weather with associated delays and disruptions. Commencing in January 1979 plaintiffs submitted monthly claims for the asserted extra costs of performing the completion work under adverse conditions brought about by the previous suspension. These claims for so-called "impact" costs totaled $1,628,553.14 plus a $75,344.66 impact claim on behalf of a subcontractor. The Corps of Engineers made interim payments of $60,000 and $557,300 on this total "impact" claim of $1,757,897.80. As required by the applicable regulations, audits of the "impact" claims were conducted by the Corps.

Based on the audit results, the Corps sent a proposed contract modification to plaintiffs in the amount of $728,436.17 for the "impact" claims.

Plaintiffs rejected the Corps' price proposals for both the suspension period claim and the impact claim.

By a letter dated July 24, 1979 plaintiffs requested a final decision by the contracting officer on their suspension period claim. The letter stated (in part):

On November 1, 1978 we submitted our claim in the amount of $749,511.42 which represents our costs due to your suspension of all operations on the referenced project during the period August 24, 1978 through October 27, 1978. Our basis for determining these costs was discussed and agreed upon during our meeting with Colonel James W. Ray and his staff on October 24, 1978. On November 18, 1978 we received Contract Modification P00033 which authorized an interim payment in the amount of $700,-000.00 on this claim. On May 7, 1979 we received Contract Modification P0033, Supplement No. 1 which reduced the interim payment by $265,038.20 to allow a payment of $434,961.80 for costs due to the suspension. We do not agree to the terms of Contract Modification P00033, Supplement No. 1.

\* \* \* \* \* \*

In consideration of the above facts we can not accept the terms of Modification No. P00033, Supplement No. 1. We therefore request your reconsideration of our claim in the amount of $749,511.42 as submitted November 1, 1978 for all costs associated with your suspension of work on this project. If you require a resubmittal of the supporting documentation for this claim please contact this office.

It is our understanding the terms of "The Contract Disputes Act of 1978" (Public Law 95–563) will apply to claims submitted after October 31, 1978 and we therefore request a final decision of the Contracting Officer regarding this claim as required in this act.

On October 1, 1979 a final decision was rendered by the contracting officer on plaintiffs' suspension period claim, which contained the following determination:

9. Your request for additional payment in the amount of $314,549.62 due to Suspension of Work on the contract from 24 August 1978 to 18 October 1978 is hereby denied for the following reasons:

a. The total price for the cost of the suspension was proposed by the contractor in the amount of $749,511.42. The audit disclosed total unallowable costs of $314,549.62, leaving total accepted costs of $434,961.80. Modification P00033 authorized an interim payment of $700,-000.00, subject to issuance of a Supplemental Order adjusting price and time, if required. Based on the results of the audit, Modification No. P00033, Supplement No. 1, was issued, reducing the interim payment to the amount supported by the audit, $434,961.80. I therefore find this amount is the total cost incurred by the contractor due to the suspension. The remainder of the claimed costs, $314,549.62, being unsupported by audit, is hereby denied.

b. The principal area of disagreement lies in equipment costs for contractor owned equipment. General Provision 65 "Pricing of Adjustments" incorporates Armed Services Procurement Regulations, Section XV, into the contract. ASPR 15–402.1(c) states that costs on contractor owned equipment shall be based upon the "Contractor's Equipment Ownership Expense Schedule" Sixth Edition, 1966, published by the Associated General Contractors of America, Inc. It also provides that during suspension periods the allowance for contractor owned equipment shall not exceed 50% of the rates computed in accordance with the above cited AGC Schedule. Accordingly, you have been allowed equipment costs in accordance with the terms of the contract.

By a letter dated April 25, 1980 plaintiffs requested a final decision by the contracting officer on the impact claim. The letter stated (in part):

We return your proposed Change Order No. P00037, Supplement No. 2 for the referenced Contract. We determine this modification is not acceptable as written.

\* \* \* \* \* \*

Our claim for impact of the suspension was prepared on the basis of the agreement reached with Colonel J.W. Ray on October 24, 1978. At that meeting Colonel Ray agreed to use the equipment rental rates which had been negotiated for the project in 1975 as the basis for increased equipment costs and 50 per cent of those rates for any equipment standby costs. Colonel Ray also agreed to pay us a 10 per cent profit mark up on our impact of suspension claim.

Based upon the agreements reached at this meeting we returned to work on October 30, 1978 and we have now completed the project.

In consideration of these facts we can not accept the proposed settlement you have offered for Contract Modification P00037.

It is our understanding the terms of "The Contract Disputes Act of 1978" (Public Law 95–563) will apply to claims submitted after October 31, 1978 and we therefore request a final decision of the Contracting Officer regarding this claim as required in this act.

On January 16, 1981 the contracting officer issued a final decision on plaintiffs' suspension impact claim, setting forth the following determination (in part):

12. Your request for additional payment on Modification No. P00037 is denied:

a. With regard to equipment costs, General Provision 65 "Pricing of Adjustments" incorporates Armed Services Procurement Regulations, Section XV, into the contract. ASPR 15–402.1(c) states that costs on contractor owned equipment shall be based upon the "Contractors' Equipment Ownership Expense Schedule" Sixth Edition, 1966, published by the Associated General Contractors of America, Inc. It also provides that during suspension periods the allowances for contractor owned equipment shall not exceed 50% of the rates computed in accordance with the above cited Associated General Contractors' Schedule. Accordingly, you have been allowed equip-

ment costs in accordance with the terms of the contract.

b. With regard to profit, General Provision 23 "Suspension of Work" states that no profit will be allowed on suspension costs.

c. No Government representative, including the Contracting Officer, has the authority to deviate from these General Provisions.

Following this denial of plaintiffs' claims for additional compensation, the instant litigation ensued.

*Discussion*

Based the facts as stated above, defendant moves for summary judgment asserting that, as a matter of law, plaintiffs have received all the compensation permitted by the Bear Creek Lake contract and the applicable regulations. Plaintiffs oppose defendant's motion and cross move for partial summary judgment, asserting entitlement as a matter of law to additional compensation under agreements reached with the contracting officer in October 1978. While plaintiffs seek to recover all the costs not awarded by the contracting officer, there are two major claim items at issue. These items are: (1) the rate to be paid to compensate plaintiffs for their construction equipment; and (2) a 10 percent markup for profit on the costs involved in plaintiffs' suspension impact claim.

The Bear Creek Lake contract contained a "Pricing of Adjustments" clause which stated:

When costs are a factor in any determination of a contract price adjustment pursuant to the "Changes" clause or any other provision of this contract, such costs shall be in accordance with Section XV of the Armed Services Procurement Regulations as in effect on the date of this contract. (ASPR 7–103.26)

Section XV of the Armed Services Procurement Regulations contained section 15–402.1 "Construction Plant and Equipment" which states (in part):

(a) * * * Accordingly, unless the contract specifically provides to the contrary usage costs for construction plant and equipment under cost reimbursement type contracts and fixed price type contracts shall be determined as provided in subparagraphs (b) and (c), respectively.

*　　*　　*　　*　　*　　*

(c) Evaluation of costs for the use of construction plant and equipment, in sound and workable condition, which are owned or controlled by a contractor or subcontractor and are furnished or the proper and economical performance of a fixed-price type contract shall be based upon the "Contractors' Equipment Ownership Expense Schedule" Sixth Edition, 1966, published by the Associated General Contractors of America, Inc. This represents a percentage of acquisition cost per working month or fraction thereof for the period of time the equipment is required for the job. If the equipment has already exceeded the assigned service life indicated by the percentage used for depreciation, one year shall be added to the actual age of the equipment and the depreciation percentage shall be revised accordingly. The allowance for equipment ownership expense, computed as provided herein shall be considered to include all costs of depreciation, major repairs and overhaul, and overhead applicable to the equipment. Accordingly, there shall be eliminated from all direct and indirect charges under the contract all costs applicable to items of equipment which are included in the allowance for ownership expense. In considering total costs under any contract, no allowance for overhead shall be applied to the allowance for equipment ownership expense. Since costs incident to maintenance and minor and running repairs are not reflected in the ownership Schedule, separate allowance shall be made therefor. In periods of suspension of work for the convenience of the Government under an appropriate contract clause, the allowance for equipment ownership expense shall not exceed 50% of the amount computed as herein indicated.

Notwithstanding any sale and leaseback, or the acquisition of construction plant and equipment by individuals, firms, corporations, or trusts, other than the contractor, and the leasing or rental of such construction plant and equipment to the contractor, the amount to be considered as a cost covering the use of such equipment shall not exceed the allowance for ownership expenses computed as indicated herein. Under certain circumstances, because of the long duration, special nature, or location of the work, it may be more economical to charge the net cost of items of construction plant and equipment directly against a contract in lieu of use of the ownership Schedule. In such cases, where the contract, record of negotiations, or attendant circumstances indicate that particular item of construction plant and equipment were purchased for use solely under a specific contract, the cost of such items, less their proper resale or salvage value, may be charged to the contract as a direct charge, together with costs of repairs, overhaul, and maintenance incident thereto.

Accordingly, the Bear Creek Lake contract required that in determining a price adjustment pursuant to any such provision of the contract, the construction equipment costs involved were to be based upon the "Contractors' Equipment Ownership Expense Schedule, Sixth Edition, 1966, published by the Associated General Contractors of America, Inc." These schedules are generally known as "A.G.C. rates." See L.L. Hall Constr. Co. v. United States, 177 Ct.Cl. 870, 881, 379 F.2d 559, 565 (1966).

On the suspension period and suspension impact claims, plaintiffs assert entitlement to enhanced A.G.C. rates for their construction equipment in reliance upon an October 1978 agreement, reached with the contracting officer, that such rates as were used in previous modifications under the contract would continue to apply. In the claim letter dated November 1, 1978 plaintiffs stated that the modification to the A.G.C. rates "we have applied is to use a ten per cent figure for interest on the investment." De-

fendant opposes any such entitlement in reliance upon the above-quoted ASPR section 15–402.1(c) which defendant asserts limits any recovery simply to the cited A.G.C. rates. Plaintiffs counter with an argument that ASPR section 15–402.1(c) is not applicable because the action taken by the Corps in suspending work on August 24, 1978 constituted a breach of contract for which the contracting officer could agree to a settlement paying enhanced A.G.C. rates in lieu of reaching a contractual price adjustment governed by the provisions of the suspension of work clause.

■ It is concluded that the action taken by the Corps of Engineers on August 24, 1978 was well within the ambit of the suspension of work clause. Suspending plaintiffs' performance of the work did not constitute a "breach of contract" such as to entitle plaintiffs to any form of relief not governed by a price adjustment clause under the contract. After funds for contract payments were no longer available and plaintiffs were so notified, then under the "Funds Available For Payment" clause, plaintiffs did have the option to continue to work, but "with the understanding, however, that no payment will be made for such work unless additional funds shall become available in sufficient amount." No provision was made under the "Funds Available for Payment" clause for any adjustment of the contract price. Rather, after 30 days of no payments, the contractor had the option to consider the contract completed, "without prejudice to him or liability to the Government * * *." However, on August 24, 1978 the Corps suspended work on the contract with the result that the suspension of work clause with its price adjustment provision was then brought into play.

Accordingly, at the cost of providing whatever price adjustment is required under the suspension of work clause, the con-

tract authorized the Corps of Engineers to suspend the work including that which plaintiffs could have otherwise carried out under their option to continue performance pending the availability of additional funds. *See C.H. Leavell & Co. v. United States,* 208 Ct.Cl. 776, 802–03, 530 F.2d 878, 892–93 (1976); *S.A. Healy Co. v. United States,* 216 Ct.Cl. 172, 576 F.2d 299 (1978). In fact, as the contemporaneous documents quoted previously in this opinion demonstrate, both parties treated the August 24, 1978 action of the Corps as a suspension of work and so characterized it.

The issue, then, is the compensation which is appropriate for the action taken by the Corps under the "Suspension of Work" clause of the Bear Creek Lake contract.

■ In this respect it is concluded that any compensation agreement reached between plaintiffs and the contracting officer in October 1978 which is not sanctioned by the Bear Creek Lake contract and/or the applicable regulations cannot form a basis for a judgment in this litigation.[1] It is true that the government has inherent authority to contract and to settle disputes. *Peters v. United States,* 694 F.2d 687 (Fed.Cir. 1982). However, to effect a valid agreement with the United States, the government officer involved must have express authority to so bind the United States. *C.P. Squire Contractors, Inc. v. United States,* 716 F.2d 865 (Fed.Cir.1983); *Urban Data Systems, Inc. v. United States,* 699 F.2d 1147, 1153–54 (Fed.Cir.1983). As defendant has demonstrated in references set forth in its brief, the contracting officer, absent approvals from higher authority, did not have authority to deviate from the applicable contract clauses and regulations such as ASPR 15–402.1(c). *See Bethlehem Steel Corp. v. United States,* 206 Ct.Cl. 122, 511 F.2d 529, *cert. denied,* 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1975).

---

**1.** Neither party has addressed the issue whether an essentially oral agreement would be enforceable in the circumstances of this case. *See* 31 U.S.C. § 1501(a) (1976 & Supp. V 1982); *United States v. American Renaissance Lines, Inc.,* 494 F.2d 1059 (D.C.Cir.), *cert. denied,* 419 U.S. 1020,

95 S.Ct. 495, 42 L.Ed.2d 294 (1974); *Narva Harris Construction Corp. v. United States,* 216 Ct.Cl. 238, 243, 574 F.2d 508, 511 (1978); *Kinzley v. United States,* 228 Ct.Cl. 620, 661 F.2d 187 (1981).

This is not to indicate, however, that the equipment cost agreement plaintiffs assert was reached with the contracting officer in October 1978 would not be valid. Neither party has cited or discussed the substantial history underlying the drafting of ASPR 15–402.1 which is set forth in *Nolan Brothers, Inc. v. United States*, 194 Ct.Cl. 1, 11–16, 437 F.2d 1371, 1376–79 (1971). In *Nolan Brothers* the court noted that under the applicable provision of the A.G.C. schedule, listed rates are subject to adjustment to fit the experience of the individual contractor. The court stated that "The Manual itself thus allows for deviation and adjustment in individual cases." 194 Ct.Cl. at 16, 437 F.2d at 1379. The court ruled that the presumption is in favor of the schedule and that the burden of proof is on the party "desiring a deviation from the Schedule to show that an individual or particularized departure is warranted and ought to be made." *Id.*

■ Accordingly, it may be that plaintiffs could establish (or did establish with the contracting officer) the basis for an enhancement of the A.G.C. schedule rates, within the ambit of ASPR 15–402.1, but this does not appear of record in the submissions to date and the equipment cost matter is simply not ripe for the entry of a summary judgment.

■ A different result must be reached with respect to plaintiffs' claim for a ten percent profit markup on suspension impact costs. The "Suspension of Work" clause does not permit profit in the price adjustment authorized under that provision. Even if the suspension of work were viewed as a breach of contract, profit on resulting increased costs would not be recoverable. *Meva Corp. v. United States*, 206 Ct.Cl. 203, 511 F.2d 548 (1975). In addition, an agreement to add ten percent to costs subsequently to be incurred would offend the prohibition on cost-plus-a-percentage-of-cost contracting. *Laburnum Construction Corp. v. United States*, 163 Ct.Cl. 339, 353, 325 F.2d 451, 459 (1963); *Urban Data Systems, Inc. v. United*

*States*, 699 F.2d 1147, 1153–54 (Fed.Cir. 1983).

Accordingly, it is concluded that with respect to plaintiffs' ten percent markup claim, summary judgment is appropriate on defendant's motion.

Finally, as set forth in the documents quoted previously in this opinion, plaintiffs' claims to the contracting officer encompassed all of their submitted and certified suspension cost items. In essence, the contracting officer denied all such items except to the extent the costs were supported by the several reports obtained from the Corps of Engineers auditors. These disallowed cost items have been placed in issue by the pleadings in this litigation, but are not addressed in the motions now before the court. Thus, no basis exists on which summary judgment could be granted with respect to such items as labor costs and home office G & A, to the extent disallowed by the contracting officer.

*Conclusion*

For the foregoing reasons, it is ORDERED:

(1) A partial summary judgment shall be entered in favor of defendant dismissing plaintiffs' claims for breach of contract and for a ten percent markup on suspension impact costs;

(2) Except as so granted in (1), defendant's motion for summary judgment is otherwise denied;

(3) Plaintiffs' cross-motion for summary judgment is denied; and

(4) Pretrial proceedings shall, by separate order, be reinstated with respect to plaintiffs' remaining claims under the suspension of work clause of the Bear Creek Lake contract.