**HOLLOWAY CONSTRUCTION COMPANY, et al., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 535–80 C.**

United States Claims Court.

Oct. 11, 1989.

Carl F. Schier, Birmingham, Mich., for plaintiff.

William K. Olivier, Washington, D.C., with whom was Acting Asst. Atty. Gen., Stuart Schiffer for defendant.

## OPINION

RADER, Judge.

In 1975, plaintiff entered a contract with the United States Corps of Engineers (Corps) to construct a large flood control dam at Bear Creek Lake, Colorado. On August 24, 1978, the Corps ordered plaintiff to suspend work due to exhaustion of funds. The suspension ended on October 27, 1978. Plaintiff resumed work on October 30, 1978. On November 1, 1978, plaintiff submitted a claim for additional costs caused by the suspension.

Upon denial of a portion of its claim, plaintiff filed suit in the United States Court of Claims on September 30, 1980. The successor to the jurisdiction of the Court of Claims, the United States Claims Court, issued two opinions—one in 1984 and another in 1985—narrowing the issues of this case. After receiving the case on October 18, 1988, this court held a trial in June 1989. On the basis of the trial record, this court rules that plaintiff has not shown entitlement to additional compensation for the suspension period in 1978.

## BACKGROUND

In 1975, the Corps contracted with plaintiff for construction of a flood control dam in Colorado. In August 1978, the Corps

ordered plaintiff to suspend work due to exhaustion of funds. In October 1978, plaintiff resumed work and, a short time later, filed a claim for the costs of suspension. Specifically, plaintiff sought pay for equipment ownership expenses—the expense of maintaining trucks, cranes, and other equipment idle at the work site for two months.

The Corps reimbursed plaintiff for equipment ownership expenses according to the formula in *Contractors' Equipment Ownership Expense*, Sixth Edition, 1966, published by the Associated General Contractors of America, Inc. (AGC manual or schedule). Transcript of Proceedings, No. 535–80C, filed July 17, 1989 (Tr.), Exhibits (Ex.) D–24; P–24. Plaintiff claimed, however, to have reached an agreement with the Corps, before returning to work in 1978, that provided more pay for equipment ownership expenses than AGC manual rates.

In 1984, the Claims Court issued its first opinion clarifying the legal ramifications of the 1978 suspension order. *Holloway Constr. Co. v. United States*, 4 Cl.Ct. 779 (1984) (*Holloway I*). This court adopts as its general statement of facts the findings of the court in *Holloway I*. *Id.* at 780–86.[1]

*Holloway I* determined that the Corps did not breach the contract by ordering a work suspension on August 24, 1978. The court ruled that the Corps had acted in conformity with the contract's suspension of work clause. Consequently, plaintiff would receive only those price adjustments covered by the contract's suspension provisions. *Holloway I*, 4 Cl.Ct. at 788.

The contract required all price adjustments to conform to the Armed Services Procurement Regulations (ASPR). ASPR Section 15–402.1(c) governs "Construction Plant and Equipment." This section required use of the AGC manual to determine equipment ownership expenses. Accordingly, *Holloway I* required plaintiff to establish entitlement to price adjustments by reference to ASPR, which in turn refer-

enced the AGC manual. *Holloway I* stated:

> As defendant has demonstrated in references set forth in its brief, the contracting officer, absent approvals from higher authority, did not have authority to deviate from the applicable contract clauses and regulations such as ASPR 15–402.-1(c).

*Id.* at 788.

*Holloway I* denied plaintiff's claim that it had reached an agreement with the contracting officer in October 1978 before resumption of work. The *Holloway I* court concluded:

> [A]ny compensation agreement reached between plaintiffs and the contracting officer in October 1978 which is not sanctioned by the Bear Creek Lake contract and/or the applicable regulations cannot form a basis for a judgment in this litigation.

*Holloway I*, 4 Cl.Ct. at 788 (footnote omitted). Thus, the Claims Court determined that plaintiff could not rely on the purported October 1978 agreement to justify a departure from the AGC schedule.

*Holloway I* suggested, however, that plaintiff might prove entitlement to compensation beyond the AGC manual based on the doctrine of *Nolan Bros., Inc. v. United States*, 194 Ct.Cl. 1, 437 F.2d 1371 (1971). In *Nolan,* the Court of Claims held that the AGC manual itself "allows for deviation and adjustment in individual cases." *Nolan,* 437 F.2d at 1379. *Holloway I* concluded:

> [I]t may be that plaintiffs could establish (or did establish with the contracting officer) the basis for an enhancement of the A.G.C. schedule rates, within the ambit of ASPR 15–402.1, but this does not appear of record in the submissions to date and the equipment cost matter is simply not ripe for the entry of a summary judgment.

*Holloway I*, 4 Cl.Ct. at 789.

Later, defendant filed another motion for partial summary judgment. Defendant

---

1. In addition to the facts articulated in *Holloway I,* this court, as a result of trial, finds additional facts supporting its conclusions.

contended that the 1978 suspension did not justify any enhancement of the AGC manual rates under the *Nolan* doctrine. *Holloway Const. Co. v. United States,* Unpublished Opinion, No. 535–80C, filed December 27, 1985, at 2 (*Holloway II*). Defendant maintained that plaintiff had not shown and could not show that their actual costs exceeded the compensation already paid according to the AGC manual.

Plaintiff responded that mounting inflation in 1978 justified enhancement of AGC manual rates under the *Nolan* standard:

[P]laintiffs assert that the special factor or feature which makes it inappropriate or unfair to use average or normal costs (either A.G.C. or contractor's own) is the escalating cost of equipment ownership during the contract period. The cost was allegedly compounded by the fact that the contractors were using equipment which had been purchased used, the purchase price being the base to which the plaintiffs contend the A.G.C. formula should be applied.

*Holloway II,* at 6.

The *Holloway II* court concluded:

To date, the parties have filed no additional submissions which conclusively demonstrate whether plaintiffs could establish or did actually establish with the contracting officer the basis for an appropriate enhancement of the A.G.C. schedule rates. The court is unable to determine whether the *Nolan Brothers, id.,* standard has been met. A substantial issue of fact still exists as to whether plaintiffs have a valid basis for enhancement of A.G.C. schedule rates. As such, it is concluded that a triable issue of material fact is before the court....

*Holloway II,* at 7.

This court held a trial primarily to determine whether the facts surrounding the suspension period justify payment for plaintiff's equipment ownership expenses beyond the rates set by the AGC manual. By virtue of the groundwork laid in *Holloway I* and *Holloway II,* the *Nolan* case sets the standard for much of this trial.

Although the primary issue for trial involved the *Nolan* standard, plaintiff also tried to prove entitlement to additional equipment operation and labor costs. Plaintiff asserted three reasons for this additional pay. First, plaintiff contended that the suspension period forced it to work during the winter weather season. According to plaintiff, the suspension prevented completion of the project during the productive late summer months. Therefore, plaintiff sought payment for additional work performed due to inclement weather.

Second, plaintiff contended that the suspension caused many inefficiencies that delayed completion. For instance, plaintiff maintained that the suspension required plaintiff to release many skilled laborers who did not return to the job two months later. The retraining period for new employees caused delays.

Finally, plaintiff alleged that the suspension required it to "double handle" stone. Instead of driving onto the dam and unloading stone directly from the trucks, plaintiff asserted that inclement weather prevented the trucks from driving on the dam. Rather, the trucks dumped the stone near the dam where it was reloaded onto off-the-road haulers for conveyance across the dam.

Plaintiff's last claim was for $630.00. Plaintiff sought payment for two employees who began start-up preparations two days before the parties agreed to resume work.

## DISCUSSION

The Court of Claims examined at length the language and purpose of the AGC manual:

This manual, first put out in 1920, is a widely-used guide to construction contractors' equipment ownership expense, reflecting both the experience of equipment owners throughout the country and also the average of operating conditions....

The theory of the Schedule, to use its own words, is that "the annual equipment expense * * * must be recovered by a contractor from the work that he performs. To do this, it is necessary to

establish for each item a monthly charge of such amount that when multiplied by the average of working months it will yield a revenue equal to the annual expense * * *." For instance, the expense of storing equipment between jobs must be recovered from the jobs worked.

*Nolan,* 437 F.2d at 1374–75 (citation omitted).

Although drafted to account for "both the experience of equipment owners throughout the country and also the average of operating conditions," *id.* at 1374, the AGC manual itself recommended "adjustment to fit the experience of the individual contractor." Tr., Ex. P–24, at 1. The Court of Claims acknowledged that the "Manual itself thus allows for deviation and adjustment in individual cases." *Nolan,* 437 F.2d at 1379.

■ The Claims Court's predecessor, however, did not issue a warrant for wholesale departure from the AGC manual. Rather the Court of Claims placed careful and clear limitations on deviations from the AGC manual:

[T]he presumption is nevertheless still in favor of the Schedule—on which the regulation declares that the "evaluation of costs" "shall be based"—and the burden of proof is on the party (contractor or Government, as the case may be) desiring a deviation from the Schedule to show that an individual or particularized departure is warranted and ought to be made.

*Id.* Thus, plaintiff in the case at bar bears the burden of showing individual or particularized circumstances justifying enhancement of AGC rates. Moreover, the Court of Claims emphasized that plaintiff must satisfy a weighty burden:

Unless there is a persuasive, specific showing that the Schedule rate should not be used, that is the rate which is to control.

*Id.* Plaintiff must make a "persuasive" and "specific" showing to satisfy its burden.

The Court of Claims also set the standard for the type of evidence which would meet this burden:

There must ... be proof by the party desiring use of actual costs that these costs are either (a) adequately representative of the particular contractor's normal or average costs (in other words, a proper substitute for the AGC rate, which takes account of the full life of the equipment and its lifetime cost), or (b) attributable to some special factor or feature which makes it inappropriate or unfair to use average or normal costs (either the AGC average or the contractor's own average) in the particular instance.

*Nolan,* 437 F.2d at 1379 (footnote omitted). *Holloway II* also endorsed this language as the standard for deviating from the AGC schedule. *Holloway II,* at 6, n. 4.

*Inflation*

As suggested by *Holloway II,* plaintiff attempted at trial to meet its burden by satisfying the second part, or part (b), of the *Nolan* standard. Plaintiff contended that special factors or features of the 1978 suspension period required enhancement of the average or normal costs contained in the AGC schedule. Plaintiff claimed that the high inflation rate in 1978 generated costs uncompensated by the AGC manual.

■ Plaintiff did not show sufficient evidence to justify departure from the AGC schedule. Inflation is not a unique, individual circumstance warranting departure from the AGC manual. The Court of Claims in *Nolan* clarified that a contractor must show an "individual or particularized" circumstance to justify departure from the AGC schedule. Far from an individual harm, inflation strikes all contractors across-the-board. No sector of the economy is exempt from the vagaries of inflation.

Moreover, the introduction to the 1966 edition, upon which the *Nolan* court relied heavily in permitting deviations from the schedule in individual circumstances (*Nolan,* 437 F.2d at 1378–80), suggests that the AGC manual accounts for inflation:

[P]revious editions did not fully take into consideration variations in the purchasing power of the dollar, since such varia-

tions had been gradual, and within the relatively short life of construction equipment were not considered to be a major factor.

Tr., Ex. P–24, at 1. This language implies that the 1966 edition corrected a flaw in previous editions by accounting for "variations in the purchasing power of the dollar," or inflation.[2]

Plaintiff argues that other language in the "Foreword" allows contractors to depart from the requirements of the AGC manual to account for inflation. Tr. at 770–71. Plaintiff relies on the following language:

> The importance of this factor has since increased at an accelerated rate, and the additional factor of replacement costs, as related to both major repairs and replacement of the machine as a whole, is again recommended for consideration by the contractor in calculating his equipment costs.

Tr., Ex. P–24, at 1. The "Foreword," however, later identifies several possible bases for departure from AGC rates but does not mention inflation:

> It is intended that this schedule be used as a guide, and it is recognized that individual experience may vary within a fairly broad range from the averages shown here. Some of the basic factors justifying adjustment of the rates shown are weather conditions, job location, length of construction season, type of work and care of equipment, both in operation and maintenance.

Tr., Ex. P–24, at 1. Plaintiff overlooks that this listing does not include inflation. Read as a whole, the "Foreword" suggests that the AGC manual already accounts, to some degree, for inflation. Thus, for still another reason, inflation is not an "individual or particularized" circumstance warranting adjustment of AGC schedule rates.

Although inflation itself does not justify deviation from the AGC manual, plaintiff could still have shown that inflation had an "individual or particularized" effect on plaintiff. Plaintiff did not make such a showing. For instance, plaintiff might have shown that it used a disproportionately large number of older pieces of equipment on the Bear Creek project. Because the AGC manual bases equipment ownership rates on the purchase price of the equipment, the purchase price of older equipment would not include recent inflation. Therefore, calculations from the AGC schedule on that piece of older equipment would not completely reflect recent inflation. Tr. at 186–87. Consequently, a contractor with an extraordinarily large share of older equipment might suffer an individual and particularized harm from inflation not experienced by contractors with a normal mix of new and old machinery.

*Holloway II* specifically mentioned this potential for an individual or particularized harm caused by inflation. *Holloway II*, at 6. *Holloway II* specifically noted that if a contractor worked with "equipment which had been purchased used," the acquisition price of equipment "purchased used" would not account for recent inflation.

Nonetheless plaintiff produced no evidence suggesting its use of a disproportionately large share of older equipment or used equipment. Tr. at 188–91; 203–06. To the contrary, the trial record suggests that plaintiff bought some new equipment for the Bear Creek project. Tr. at 334–35. Moreover, plaintiff's discount agreement with Caterpillar, the supplier for most of plaintiff's equipment, suggests that plaintiff regularly bought new equipment. Tr. at 360–61. Thus, the AGC manual would account for much of the impact of inflation on plaintiff. Most important, however, inflation would not be a "special factor or feature" causing plaintiff an "individual or

---

**2.** The trial evidence suggested at least two ways in which the AGC manual might account for inflation. First, the manual links its ownership rates to equipment acquisition costs. In an inflationary period, the acquisition cost of equipment rises, thus increasing equipment ownership rates with inflation. Tr. at 621–22; 664.

Second, the manual compensates generously for ownership expenses. The ownership rate includes depreciation, a factor for overhaul expenses, and a percentage for interest, taxes, insurance, storage, and other costs. Tr. at 148–49. This rate is much more generous than depreciation alone. Tr. at 646–51.

particularized" harm under the *Nolan* standard. Rather, inflation would affect plaintiff in the same manner it affected all other contractors.

Plaintiff presented only general evidence about the effects of inflation on equipment costs industry-wide. Tr. at 188–91; 209–11; 352–53. This general evidence does not support a finding of individual or particularized harm to plaintiff. Consequently, plaintiff did not satisfy the *Nolan* standard.

For another reason as well, plaintiff did not meet the *Nolan* standard. The Court of Claims in *Nolan* suggested that the party seeking enhancement of AGC rates would need to present evidence of actual cost as an alternative to the AGC schedule. For instance, the Court of Claims made departure from AGC rates available only to a "party desiring use of actual costs" as an alternative to the manual. *Nolan*, 437 F.2d at 1379.

The Court of Claims further explained the *Nolan* standard in 1975:

> [T]he burden is on the party seeking to substitute the AGC costs for the contractor's own actual, booked costs to demonstrate that the contractor's own costs (as shown) are inadequate or incomplete or do not represent the full cost rightly attributable to the particular contract.

*Meva Corp. v. United States*, 206 Ct.Cl. 203, 221, 511 F.2d 548, 559 n. 10a (1975). On a second occasion, the Claims Court required proof of actual cost before authorizing a departure from AGC rates. Proof of actual costs would prevent a contractor from reaping a windfall in excess of its actual cost in the event the court authorized a departure from AGC rates.

In applying the *Nolan* standard, the Claims Court stated:

> The court in *Nolan* recognized, however, that even though the regulation at issue in that case created a presumption of use of AGC rates, in certain circumstances, the actual costs of the contractor could be used in some circumstances.

*G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 663, 732 (1984). The Claims Court also read *Nolan* to require proof of actual costs to justify a departure from AGC rates.

In this case, plaintiff offered no proof of its actual costs incurred due to the suspension. *See, e.g.*, Tr. at 190–94; 200–05; 783–85. This fatal oversight precluded this court, under the *Nolan* standard, from authorizing an enhancement of AGC rates.

*Weather Delays*

■ Plaintiff contended that the suspension period prevented completion of the project before the onset of winter. Without the two-month delay, plaintiff argued that it would have finished before bad weather intervened. Plaintiff apparently suggested that inclement weather both satisfied the *Nolan* standard for an enhanced AGC rate and also justified additional compensation by prolonging the duration of the project beyond the projected and compensated completion date.

The "Foreword" to the AGC manual suggests that weather conditions might justify departure from the schedule rates. To satisfy the *Nolan* standard, however, plaintiff must show that weather conditions deviated far enough from normal, seasonal conditions to cause an "individual and particularized" harm. Indeed the AGC manual itself already accounts for normal weather fluctuations:

> The average number of working months for each item of the schedule is based on average climatic conditions for the nation as a whole, such as usually prevail in the central states, upon normal business conditions, and upon normal seasonal fluctuations of the industry.

Tr., Ex. P–24, at 3. Colorado fits the description of a central state. Therefore, the AGC manual already accounts for normal seasonal fluctuations and average climatic conditions in Colorado. Plaintiff would need to show an extraordinary deviation from those conditions to warrant departure from the AGC schedule.

Plaintiff presented no evidence of abnormal or extreme weather conditions. In fact, plaintiff objected to evidence showing the weather conditions in nearby Denver, Colorado, during some of the time under consideration in this case. Tr. at 48–50;

814–16. Mr. Donald J. Nessan, whom plaintiff acknowledged as a respected and highly skilled engineer (Tr. at 566–67), recalled that weather conditions were normal for Colorado in late 1978 and early 1979. Tr. at 600–01; 608–10. In the absence of any contrary evidence, this court cannot conclude that abnormal weather conditions justified a departure from the AGC manual.

Plaintiff also contended that the suspension pushed project completion back into inclement weather and increased the duration of the project. Plaintiff did not meet its burden on this point. Plaintiff presented no evidence that the weather forced it to close down or reduce operations during the winter months. Plaintiff offered no daily log correlating unproductive days with bad weather.

Plaintiff offered only a graph showing that the amount of work performed, computed in dollars compensated, tapered off during the months after the suspension period. Tr. at Ex. P–2. This evidence does not necessarily show that weather conditions arrested or retarded progress. Mr. Nessan testified that this tapering effect was normal and expected for a project like the Bear Creek enterprise. Tr. at 593; 597. On an earthen dam like Bear Creek, the structure becomes narrower near the top. This narrowing limits the amount of equipment that can operate in the dwindling space and reduces productivity. Tr. at 548–50. In fact, as Mr. Nessan pointed out in reference to Plaintiff's Exhibit 2, productivity already started to taper off before the suspension period began in August. Tr. at 586–87.[3] Mr. Nessan concluded that this natural tapering occurs "due to the configuration of the dam." Tr. at 587. In light of Mr. Nessan's credible testimony, plaintiff did not show that weather prolonged the duration of the project.

Mr. Nessan also questioned plaintiff's estimates of both the amount of work completed at the time of suspension and the projected date of completion if suspension had not occurred. Plaintiff estimated that its work was 96.3% complete at the time of suspension. Tr. at 100. Plaintiff based this estimate on Exhibit 2 which showed $26,064,649.00 of completed work out of the total contract work of $27,054,309.00. Mr. Nessan, however, provided a more accurate estimate that the work was only 92.5% complete at the time of suspension. Tr. at 544. Contractors, including plaintiff, generally "front-end load" a contract, according to Mr. Nessan. He explained that contractors include compensation for clean-up work done at the end of the contract in unit prices billed at the beginning of the contract. Tr. at 534–36. Thus, the dollar figures in Plaintiff's Exhibit 2 would include payment for work not yet done at the time of suspension. For this reason, Mr. Nessan's estimate is more accurate.

Due to tapering efficiency and extensive clean-up work, among other factors, Mr. Nessan testified that plaintiff's estimated completion date of November 15, 1978 (Tr. at 110), was overly optimistic. Tr. at 539–44. Mr. Nessan anticipated that, without any suspension, plaintiff would still have needed to work into the spring of 1979 to complete the job. Tr. at 545. In light of Mr. Nessan's convincing testimony, plaintiff did not show that weather or any other uncompensated factor extended the duration of the project.

*Inefficiencies*

Plaintiff contended that loss of experienced personnel during the suspension caused great inefficiencies upon resumption of work. Tr. at 106. In the colorful language of Mr. John L. Albrecht, plaintiff's former project manager, "A grader man is an artist. They're not made, they're born...." Tr. at 127–28. According to Mr. Nessan, however, sufficient graders and other construction artists had been born to replenish Mr. Albrecht's crews. Tr. at 594–96. In Mr. Nessan's words, "most operators that they get out of the union are qualified. If they were not qualified, I know Mr. Leach, who was the con-

---

**3.** According to page 2 of Plaintiff's Exhibit 2, plaintiff performed $842,662.00 of work during June, 1978; $818,857.00 of work during July; and only $460,035.00 from August 1–24. The Corps suspended work on August 24, 1978.

tractor's superintendent on the site, nobody stayed around at all who was not qualified." Tr. at 596.

Once again, plaintiff presented no documentary evidence or specific testimony about the number of new employees hired to replace its "artists." Plaintiff, with the exception of "double handling" of stone discussed later, presented very little specific evidence about inefficiency delays.[4] Rather, plaintiff relied on its witnesses' impressions that the new hands were not up to the task. Mr. Nessan, to the contrary, observed no extraordinary inefficiencies and human errors after resumption of work. Tr. at 594–97.

In sum, as discussed above, plaintiff did not meet its burden of showing that the uncompensated factors related to the suspension prolonged the project. Moreover, plaintiff did not prove any uncompensated inefficiencies directly caused by the suspension.

### "Double Handling" of Stone

■ Plaintiff contended that the suspension required inefficient "double handling" of stone during inclement weather. Tr. at 294; 726. Mr. Nessan explained, however, that placing the stone in a stockpile near the dam until needed for placement by the crane was reasonable and acceptable practice for this project. Tr. at 561–66. Plaintiff presented no evidence that it planned before the suspension to drive trucks, rather than safer haulers, across the narrowing top of the dam. Plaintiff simply did not show that the suspension, rather than a pre-existing practice or a reasonable management decision, compelled "double handling."

This "double handling" claim relies on allegations of inclement weather and delays caused by inefficiency. Once again, plaintiff did not prove by a preponderance of evidence that inclement weather or suspension-related inefficiencies prolonged work on the Bear Creek Dam. According to Mr. Nessan's more credible schedule, plaintiff would have worked through the

winter. Hauling stone from stockpiles with safer vehicles during winter would likely have been necessary even without a suspension. Thus, plaintiff did not meet its burden on this claim.

### $630.00 of Start-up Costs

Plaintiff employed two individuals to begin preparations for resumption of work prior to the agreed start-up date. These individuals resumed work before the parties agreed that compensation would begin. Because outside the parties' start-up agreement, this expense is uncompensable. During trial, this court promised to chide both parties for requiring judicial resolution of $630.00 in the context of a $28,159,133.00 contract. Perhaps this mention accomplishes that purpose.

### CONCLUSION

Under the terms of the contract it freely entered, plaintiff received compensation for the 1978 suspension period in conformity with the AGC manual. Plaintiff sought to prove that "individual or particularized" circumstances justified enhancement of the AGC schedule rates under the *Nolan* test. Plaintiff did not meet its burden of proving that 1978 inflation or weather conditions in Bear Creek satisfied the *Nolan* standard. Moreover plaintiff did not prove that any other uncompensated factor prolonged completion of the project or caused inefficiency and delay.

This court dismisses the complaint and directs the Clerk to enter judgment accordingly.

No costs.

---

4. Plaintiff also complained of survey stakes disrupted during the winter by joy-riders on snowmobiles. Tr. at 297. At that time, however, the dam remained in plaintiff's custody and plaintiff had the responsibility to prevent vandalism.